RON BENDER (SBN 143364)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: RB@LNBYG.COM; JPF@LNBYG.COM

Counsel for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No.: 23-51520 |
| BRITELAB, INC., a Delaware corporation | Chapter 11 Case (Subchapter V) |
| Debtor and Debtor in Possession. | **Debtor's Emergency Motion for an Order (I) Authorizing Debtor to Obtain Post-petition Financing Pursuant to 11 U.S.C. § 364(c) & (d) on an Interim Basis; (II) Setting a Hearing on Final Basis; and (III) Granting Related Relief; Memorandum of Points and Authorities** |
| | [Declaration of Ali Bushehri in Support Filed Separately and Concurrently] |
| | **Emergency Hearing Requested:** |
| | Date: To be set by court |
| | Time: To be set by court |
| | Place: United States Courthouse Courtroom 9 280 South First Street San Jose, CA 95113-3099[1] |

---

[1] The hearing on this matter will take place remotely by video or telephone. No in-person appearance in the courtroom is available. The Bankruptcy Court's website provides information regarding how to arrange an appearance at a video or telephonic hearing. If you have questions about how to participate in a video or telephonic hearing, you may contact the courtroom deputy, Anna Lee, at (408) 278-7517 or email her at: anna_e_lee@canb.uscourts.gov. *See also* www.canb.uscourts.gov/calendars.

Pursuant to 11 U.S.C. §§ 363(b) and 364(c) & (d), Rules 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP"), and Bankruptcy Local Rule ("BLR") 9014-1 BriteLab, Inc., a Delaware corporation (the "Debtor"), the debtor and debtor in possession in the above-referenced chapter 11 case, respectfully files this "Debtor's Motion for an Order: (I) Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364(c) & (d) on an Interim Basis; (II) Setting a Hearing on Final Basis; and (III) Granting Related Relief" (the "Motion"), seeking approval of post-petition financing on the terms set forth in the Factoring and Security Agreement (the "FS Agreement") attached as **Exhibit 1** to the separately and concurrently filed declaration of Ali Bushehri (the "Bushehri Declaration") and entry of an order substantially in the form of the proposed interim order (the "Interim Order") attached as **Exhibit 2** to the Bushehri Declaration authorizing the Debtor to use funds in accordance with the budget (the "Budget") annexed as **Exhibit 3** hereto on an interim basis to avoid immediate and irreparable harm pending a final hearing.

### INTRODUCTORY STATEMENT PURSUANT TO THE GUIDELINES FOR CASH COLALTERAL & FINANCING MOTIONS AND STIPULATIONS FOR THE BANKRUPTCY COURTS FOR THE NORTHERN DISTRICT OF CALIFORNIA

This Motion requests authority and approval for two post-petition financing loans – first, an unsecured bridge loan for $750,000 from the Debtor's parent corporation funded in July and repaid in August, and, second, a longer-term secured loan from a third party, Clear Coast Capital, LLC, as detailed below.

### BRIDGE LOAN

The material provisions of the proposed credit agreement are as follows:

1. Lender: BSC Investment Group, Inc.

2. Facility Amount: Seven-Hundred Thousand Dollars ($750,000)

3. Minimum Facility: None.

4. Collateral/Liens: None. Administrative Priority Pursuant to 11 U.S.C. § 364(b) as an administrative expense.

5. Term: Maturity date of August 31, 2024

6. Interest rate: 0%.

7. Fees: None.

8. Events of Default: Failure to repay the loan by August 31, 2024.

9. Guaranty: None.

10. Documentation: None.  Due to the short-term nature of the bridge loan, the only documentation is anticipated to be this Motion and the order(s) thereon.

**LONG-TERM LOAN**

The material provisions of the proposed credit agreement are as follows:

1. Lender: Clear Coast Capital, LLC

2. Factoring: Sale of accounts receivable

3. Production Orders Financing ("PO Financing")

4. Facility Amount: Three Million Dollars ($3,000,000)

5. Minimum Facility: Debtor must use a minimum of 30% of the facility amount quarterly

6. Collateral: Accounts receivable, equipment, and all other property of the Debtor

7. Term: 36 months

8. Advance rate: Not to exceed 85% of invoice face value up to 90 days from invoice date

9. Fees:

   a. Factoring fee of 2.15% against the face value of each invoice for the first 30-day period and 0.85% every 10-day period thereafter (based on amount of funds advanced)

   b. PO Financing of 3.65% for the first 30-day period and 1.25% every 10-day period thereafter (based on amount of funds advanced)

   c. Credit Insurance Fee of 0.35% will be added to the face amount of the invoice

   d. Default Fee of 21% simple interest per annum upon a Default

   e. Dispute Fee of 40% if a dispute arises regarding collection

   f. Termination Fee: 50% of the earned fees based on monthly minimum

10. Legal Fees: One-time $2,500 legal/closing fee plus initial legal fee deposit for coal counsel of $5,000.

3

11. Events of Default: (a) 25% or more of factored AR has aged 90 days without payment; (b) Debtor fails to pay chares or fees; (c) representations and warranties are untrue; (d) Debtor fails to adhere to obligations under the Agreement; (e) Lender reasonably deems itself to be insecure.

12. Liens: first-position senior lien on all Debtor's assets under 11 U.S.C. § 364(c) & (d)

13. Direct payment: customers will be notified to remit payments directly to Lender's lockbox

14. Guaranty: personal guaranty by owners of the Debtor

Pursuant to FRBP 4001 and the Guidelines for Cash Collateral & Financing Motions & Stipulations (the "Guidelines") promulgated by the Bankruptcy Court for the Northern District of California, the Debtor hereby provides the following disclosures with respect to the terms of the FS Agreement:

| Reference | | FS Agreement |
|---|---|---|
| FRBP 4001(c)(1)(B)(i) Guidelines 1 | A grant of priority or a lien on property of the estate under § 364(c) or (d) | Yes - ¶8 |
| FRBP 4001(c)(1)(B)(ii) Guidelines 2 | The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | N/A |
| FRBP 4001(c)(1)(B)(iii) Guidelines 3 | A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | N/A |
| FRBP 4001(c)(1)(B)(iv) Guidelines 4 | A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Yes - ¶17 |
| FRBP 4001(c)(1)(B)(v) Guidelines 5 | A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | N/A |

4

| Reference | | FS Agreement |
|---|---|---|
| FRBP 4001(c)(1)(B)(vi) | The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | N/A |
| FRBP 4001(c)(1)(B)(vii) Guidelines 6 | A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | N/A |
| FRBP 4001(c)(1)(B)(viii) Guidelines 7 | A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Yes - ¶22 |
| FRBP 4001(c)(1)(B)(ix) Guidelines 8 | The indemnification of an entity | Yes - ¶20 |
| FRBP 4001(c)(1)(B)(x) Guidelines 9 | A release, waiver, or limitation of any right under Section 506(c) | N/A |
| FRBP 4001(c)(1)(B)(xi) Guidelines 10 | The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Yes - ¶8 (and Interim Order ¶E)[2] |
| Guidelines 11 | Provisions for "carve-outs" for professionals' fees and expenses | N/A |

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served this Motion by first class mail on the Debtor's 20 largest unsecured creditors. In addition, the Debtor served the Motion and supporting papers by notice of electronic filing ("NEF") on the Office of the United States Trustee (the "UST") and the subchapter V trustee.

---

[2] The Debtor has requested that the DIP Lender lien on the estate's avoidance actions be limited to potential causes of action against the account-debtors for which the factoring sale of accounts receivable would apply (which bears some rationale to the DIP Loan to the extent that the DIP Lender might try to collect on factored accounts but be blocked by an account debtor asserting a setoff defense if later sued the estate for an avoidance action). Based on the Debtor's listing of transfers in the 90 days prior to the Petition Date [Dkt 29 at p.72-75], the Debtor believes it has no preferential transfer causes of action against its account-debtors, and the Debtor has no reason to believe there exist any fraudulent transfer or other avoidance actions against its account-debtors. Therefore, the Debtor does not believe the estate suffers any loss by permitting a lien on these subset of potential avoidance actions.

Case: 23-51520    Doc# 69    Filed: 07/10/24    Entered: 07/10/24 11:47:13    Page 5 of 86

This Motion is based on this Motion, the annexed memorandum of points and authorities, the separately and concurrently filed Bushehri Declaration, the record in this case, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order in substantially the form as attached as **Exhibit 2** hereto:

1.      Authorizing the Debtor to obtain postpetition financing up to the principal amount of $750,000 from BSC Investments, Inc. ("BSC"), as an administrative expense claim pursuant to 11 U.S.C. § 364(b) with 0% interest and a maturity date of August 31, 2024;

2.      Authorizing the Debtor to obtain postpetition financing and factoring sale of accounts receivable up to the principal amount of $3,000,000 (the "DIP Loan") from Clear Coast Capital, LLC (the "Lender"), pursuant to the terms of a Factoring and Security Agreement (the "FS Agreement"), a true and correct copy of which is attached hereto as **Exhibit "1"**, to (a) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtor, (b) pay certain transaction fees, and other costs and expenses of administration of the Debtor's bankruptcy case (the "Case"), and (c) pay fees expenses owed to the Lender pursuant to the FS Agreement;

3.      Authorizing and empowering the Debtor to execute and enter into loan documents (the "DIP Loan Documents") and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

4.      Providing, pursuant to Sections 364(c), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents be and be deemed immediately secured (without any further filings) by valid, binding, continuing, enforceable, fully perfected, and unavoidable first senior priority security interests and liens (the "DIP Liens") in and on all prepetition and postpetition property and assets of the Debtor (the "Collateral"), provided, however, that the DIP Liens shall not extend or attach to, and the Collateral shall not include, causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 545, 547, 548, 549 and 550, any other avoidance actions under the

6

Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof;

5.      Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Order;

6.      Finding that adequate notice of the Motion has been provided to grant the Motion on an interim basis pending a final hearing;

7.      Finding that immediate and irreparable harm would result if interim relief were not granted on an emergency basis to authorize the DIP Loan;

8.      Waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Order;

9.      Setting a final hearing on the Motion; and

10.     Granting related relief that the Court deems just and proper under the circumstances of this Case.

Dated: July 10, 2024                    LEVENE, NEALE, BENDER, YOO
                                        & GOLUBCHIK L.L.P.


                                        By:  ___/s/ John-Patrick M. Fritz___
                                             RON BENDER
                                             JOHN-PATRICK M. FRITZ
                                        Counsel for Chapter 11 Debtor and Debtor in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    STATEMENT OF FACTS

### A.    GENERAL BACKGROUND.

1.      On December 29, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").[3]  The Debtor is a "debtor" as defined by Section 1182 of Subchapter V of Chapter 11 of the Bankruptcy Code and elected Subchapter V on its bankruptcy petition.

2.      The United States Trustee (the "UST") appointed Gina Klump as Subchapter V Trustee (the "Trustee") in this case pursuant to Section 1183(a).

3.      The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession pursuant to Sections 1182(2) and 1184.

4.      The Debtor was incorporated in Delaware in 2007.

5.      The Debtor has approximately 48 employees.  The Debtor operates its business from a leased location consisting of approximately 52,600 rentable square feet located at 6341-6371 San Ignacio Avenue in San Jose, California.

6.      The Debtor began as a revolutionary Original Design Manufacturer (ODM) focusing on commercializing its industry proven Adaptive Build On Target (ABOT) productization platform.  The Debtor also solves the problem of semiconductor shortages by increasing manufacturing efficiency through its superior automated material handling system (AMHS) allowing it to address a growing $1.25-billion market with 6% Compound Annual Growth Rate (CAGR) projected through 2025 with only two dominant players.

7.      The Debtor specializes in highly-complex and precision-system engineering and assembly for Robotics, Automation, and Electro-Mechanical contract engineering / contract manufacturing (CE/CM) industries.  The global CE/CM service market has grown significantly to cover technologies and sub-

---

[3] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

Case: 23-51520   Doc# 69   Filed: 07/10/24   Entered: 07/10/24 11:47:13   Page 8 of 86

technologies *e.g.*, Semiconductor System and Sub-System assemblies, Battery System Assembly, Biomedical Devices, and Renewable Energy sectors.

8.      The hardware industry has witnessed a major transition wherein companies working in this industry outsource their manufacturing aspect to maintain a low cost while accelerating their product time-to-market. Original equipment manufacturers (OEMs) utilize contract manufacturers to plunge into an untapped market in a cost-effective manner, and the market is segmented into high growth end markets and industry verticals.

9.      The Debtor has substantial CE/CM capabilities, including system design and engineering capabilities in complex machine and module development, as well as electro-mechanical expertise that includes cable, harness, and printed circuit board assembly (PCBA) design.  The Debtor also has substantial capabilities in prototyping and testing with respect to material engineering, design for manufacturing and testing, rapid new product introduction (NPI) specialty for first article inspection (FAI), specialty systems, and ramp-up, organizational breakdown structure (OBS) engineering, end-of-life (EOL) support, spare parts and repairing, and refurbishing, and application engineering and on-site support.

10.     While the Debtor does not have secured creditor debt, the Debtor accumulated an unmanageable amount of general unsecured debt prior to the bankruptcy case and thereby requires the use of the Bankruptcy Code to effectuate a restructuring of that prepetition debt.

**B.  IMMEDIATE NEED FOR FINANCING.**

11.     On March 28, 2024, the Debtor filed its plan of reorganization, proposing to repay creditors' allowed claims in full.  On May 24, 2024, the Debtor filed its first amended plan of reorganization, correcting certain technical errors, but still proposing to pay its creditors allowed claims in full.  The initial hearing on plan confirmation was held on June 6, 2024, and continued to August 8, 2024.

12.     The Debtor's plan includes line items for exit financing borrowing commencing in July 2024.  The Debtor intends to go forward with its plan of reorganization, but the Debtor needs the funds in July 2024, as previously anticipated, to bridge the last few months of the case until the plan's effective date (projected to be in October 2024, i.e., the start of the fourth quarter, after accounting for the necessary time

Case: 23-51520   Doc# 69   Filed: 07/10/24   Entered: 07/10/24 11:47:13   Page 9 of 86

in August and September for a hearing, order, findings and conclusions in support of plan confirmation, and passage of a 14-day period for filing appeals).

13. The Debtor will use the $750,000 bridge loan from BSC to pay immediate expenses, then transition to the longer-term DIP Loan with Lender based on factoring AR sales and PO Financing and purchase orders continue to come in and accounts receivable are generated throughout July and going into August.

14. Due to some customers being late on some invoice payments, the Debtor fell behind in payments of rent to its landlord and the funding of payroll benefits. The bridge loan from BSC is needed to address this immediate funding need, and then the DIP Loan from Lender is needed to carry the case through plan confirmation. The Budget is itself the Debtor's actual historical post-petition performance that continues up through plan confirmation, then extends to the end of the life of the Plan so that creditors and the Court can see how the post-petition financing is used for the benefit of the larger reorganization of and benefit of the estate. (This Motion is not seeking in any way a *sub rosa* confirmation of any plan elements; rather, so close to plan confirmation, the Debtor wishes creditors and the Court to see how this is part of a long-term reorganization goal.)

### C. **PRIOR EFFORTS TO OBTAIN FINANCING.**

15. Since the Petition Date, the Debtor has been negotiating post-petition financing with multiple potential lenders going as far back as January 2024, and, in the process, the Debtor's responsible individual, Mr. Bushehri, emailed, telephoned, and/or exchanged term sheets with: (i) Gem Cap Solutions, LLC; (ii) Versant Funding LLC; (iii) United Capital Funding Group, LLC; (iv) VenPro; and (v) Lender. Comparing interest rates, fees, costs, lending terms, maximum and minimum facilities, and collateral packages, the terms from Lender were superior to the other terms offered in the market.

16. Compared to the Lender, all other possible lenders had high interest rates and/or upfront out-of-pocket due diligence fees far more expensive than the terms of the DIP Loan proposed here by the Lender. After months of searching for a loan in the market, Debtor has determined that this proposed DIP Loan is the best terms in the market.

///

## D. PROPOSED FINANCING.

17. Post-petition, the Debtor searched for post-petition financing in January, February, March, April, May, June, and July 2024, engaging in good faith negotiations to obtain the best terms achievable in the market, resulting in the proposal set forth in the FS Agreement attached hereto as **Exhibit "1"** hereto.

18. The material provisions of the proposed credit agreement are as follows:

a. Lender: Clear Coast Capital, LLC

b. Factoring: Sale of accounts receivable

c. Production Orders Financing ("PO Financing")

d. Facility Amount: Three Million Dollars ($3,000,000)

e. Minimum Facility: Debtor must use a minimum of 30% of the facility amount quarterly

f. Collateral: Accounts receivable, equipment, and all other property of the Debtor

g. Term: 36 months

h. Advance rate: Not to exceed 85% of invoice face value up to 90 days from invoice date

i. Fees:

    i. Factoring fee of 2.15% against the face value of each invoice for the first 30-day period and 0.85% every 10-day period thereafter (based on amount of funds advanced)

    ii. PO Financing of 3.65% for the first 30-day period and 1.25% every 10-day period thereafter (based on amount of funds advanced)

    iii. Credit Insurance Fee of 0.35% will be added to the face amount of the invoice

    iv. Default Fee of 21% simple interest per annum upon a Default

    v. Dispute Fee of 40% if a dispute arises regarding collection

    vi. Termination Fee: 50% of the earned fees based on monthly minimum

j. Legal Fees: One-time $2,500 legal/closing fee plus initial legal fee deposit for coal counsel of $5,000.

k. Events of Default: (a) 25% or more of factored AR has aged 90 days without payment; (b) Debtor fails to pay chares or fees; (c) representations and warranties are untrue; (d) Debtor fails to adhere to obligations under the Agreement; (e) Lender reasonably deems itself to be insecure.

l. Liens: first-position senior lien on all Debtor's assets under 11 U.S.C. § 364(c) & (d)

m. Direct payment: customers will be notified to remit payments directly to Lender's lockbox

n. Guaranty: personal guaranty by owners of the Debtor

19. The Debtor respectfully submits that the terms for the DIP Loan are the best in the market and should be approved so that the Debtor has adequate financing to reorganize.

20. A true and correct copy of the Debtor's budget projection for the bankruptcy case and proposed plan confirmation projections are attached as **Exhibit 3** hereto. The Debtor will need a minimum of $750,000 of bridge financing from BSC to keep operations going in July 2024, which will be at 0% interest, no liens, administrative claim status pursuant to section 364(b), and a maturity date of August 31, 2024.

21. The Detor respectfully submits that there is good cause to grant this Motion as being in the best interest of the estate.

## II. DISCUSSION

### A. THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED DIP LOAN

#### 1. Authorization for Post-Petition Financing Pursuant to 11 U.S.C. § 364

Pursuant to Section 364(b), a debtor may borrow funds outside of the ordinary course on an unsecured basis with court permission. 11 U.S.C. § 364(b). BSC does not have a history of lending large sums of up to $750,000 to the Debtor, and, therefore, the proposed bridge loan is not in the ordinary course. Nonetheless, it is necessary to avoid immediate and irreparable harm. BSC is willing to make the bridge loan with court permission to do so, on a short-term basis, to be paid back with 0% interest by August 31, 2024, so that the Debtor can bridge into the 36-month secured loan for up to $3,000,000 from third-party Lender, as discussed in detail below. Although at first glance the bridge loan from BSC may appear to be on better terms than the Loan from Lender, in fact, BSC is not in a position to lend as much as Lender or for as long a period of time, and, thus, the bridge loan from BSC is just that – to bridge into the Loan from Lender, which is the most favorable terms in the market that the Debtor could find after months of shopping the market.

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured

debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

> (c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

> (1) the trustee is unable to obtain such credit otherwise; and
> (2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d)(1).

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the postpetition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured postpetition credit, such credit may be obtained under certain carefully

13

proscribed conditions.  *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991).  For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d).  *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Section 364(c) also enumerates certain incentives that a court may grant to postpetition lenders.  However, the list set forth in Section 364(c) is not exhaustive.  Courts have frequently authorized the use of inducements not specified in the statute.  *See, e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to postpetition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

As discussed above, the Debtor has insufficient cash to carry its reorganization effort through July and August 2024, and, thus, requires at least $750,000 to bridge through its plan confirmation process and confirm its plan to pay creditors 100 cents on the dollar over a five-year plan.  Thus, subject to the approval of the Court, and in order to obtain the necessary DIP Loan, the Debtor has agreed to provide the Lender with a perfected senior first priority DIP Liens on all of the Debtor's prepetition and postpetition collateral to secure all obligations under the DIP Loan pursuant to Section 364(c)(2).  Lender also requires that the DIP Loan be authorized under Section 364(d) for a senior lien, but because the Debtor has no secured debt, there are no pre-existing liens to be primed, and, therefore, in this particular Case, relief under Sections 364(c)(2) and 364(d) here are the same.  For all of the reasons explained herein, the Debtor believes that granting the Lender the foregoing protections is warranted, appropriate, and necessary given the circumstances of this Case where the Lender has agreed to provide the Debtor with the necessary DIP Loan, without which the Debtor's reorganization effort would falter.

Two factors courts consider in determining whether to authorize postpetition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable

to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

The Debtor submits that all of these standards have been satisfied in this Case.

### 2. The Debtor Is Unable To Obtain Unsecured Credit Or Secured Credit On A Junior Lien Basis

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b). *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As set forth in detail in the accompanying Bushehri Declaration, the Debtor searched for financing for months from January to July 2024, and the Debtor was unable to obtain financing on an unsecured or even a junior secured basis (other than the $750,000 from its parent BSC as a mere bridge loan with a maturity date of August 31, 2024. The Debtor contacted at least four potential lenders and had discussions by telephone and/or email, and all terms offered had higher interest rates and/or higher upfront due diligence fees that were prohibitively expensive for the Debtor's cash flow needs and reorganization prospects. Based on the foregoing, and the fact that the Debtor requires access to funds by July 2024 to bridge through plan confirmation, the Debtor has concluded, in an exercise of its sound business judgment,

that the DIP Loan to be provided by the Lender represents the best financing presently available to the Debtor.

### 3. The Terms Of The Proposed Postpetition DIP Loan From The Lender Are Fair, Reasonable, and Adequate

The Debtor submits that terms of the proposed DIP Loan from the Lender are fair, reasonable, and adequate. The terms and conditions set forth in the FS Agreement were negotiated extensively, in good faith, and at arms' length by the parties. The Lender has agreed to provide the DIP Loan to the Debtor in an effort to assist the Debtor in preserving the going concern value of the Debtor's business pending a reorganization. The Debtor submits that the benefits afforded to the Debtor by the DIP Loan justify the protections being afforded under the terms of the FS Agreement. The DIP Loan offers the Debtor its best opportunity to maintain and preserve the value of its assets while pursuing a reorganization strategy to benefit all creditors and parties in interest in this Case with a 100% payment plan to creditors on the horizon.

Based on the foregoing, the Debtor believes that (1) the terms and conditions of the proposed DIP Loan under the FS Agreement are fair and reasonable, reflect the Debtor's exercise of prudent business judgment in light of the current circumstances and are supported by reasonably equivalent value and fair consideration, (2) the DIP Loan has been negotiated in good faith and at arm's length by the Debtor and the Lenders, and (3) any credit extended, loans made, and other financial accommodations extended to the Debtor by the Lender has been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

### 4. No Liens Are Being "Primed"

The Debtor has no prepetition secured creditors. Thus, no liens are being primed.

### 5. The Proposed DIP Loan Is Necessary And Proper

While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. at 37, the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's

discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

There is little dispute that, without substantial postpetition financing, the Debtor will be unable to bridge its operations from July to August 2024 and into its proposed plan confirmation for paying creditors 100 cents on the dollar; instead, the Debtor's business operations will fall into a disorderly fire-sale liquidation of its assets without the ability to maximize value through reorganization, thereby resulting in virtually no funds for the estate and its creditors (the plan shows a hypothetical liquidation recovery of 15 cents on the dollar at best). In contrast, the proposed DIP Loan affords the Debtor the ability to maintain the going-concern value of its business and provides the Debtor with the time necessary to confirm a plan and repay creditors 100 cents on the dollar. The Debtor has therefore concluded that obtaining the proposed DIP Loan from the Lender is critically important to maximizing the recovery for creditors, and is therefore in the best interests of the Debtor's estate.

**B.      THE DEBTOR SHOULD BE AUTHORIZED TO SELL ACCOUNTS RECEIVABLE**

To the extent that the DIP Loan is considered a sale of estate assets outside of the ordinary course on account of the DIP Loan FS Agreement including a factoring arrangement to sell accounts receivable at an advance rate of 85% of the face value of the receivables aged not later than 90 days, the Debtor respectfully submits that relief should be granted for such sale pursuant to 11 U.S.C § 363(b).

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification." *See, e.g., In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. at 19-20.

The Debtor submits that its proposed sale of assets clearly comports with each of these four criteria, and demonstrates that the Debtor's business judgment to proceed with the proposed sale of substantially all of its accounts receivable as part of the DIP Loan in accordance with this Motion is sound. Notice of the Motion has been provided to all creditors of the estate. The sale price in the advance rate of 85% of the face value of the accounts receivable aged not later than 90 days is fair, reasonable, and market rate, that is, the best rate that the Debtor could obtain in the market after four months of searching for DIP Loan terms. And the proposed DIP Loan is made in good faith as an arms-length transaction with a non-insider third party.

The factoring sale should also be free and clear of all liens, claims, interests, and other encumbrances pursuant to 11 U.S.C. § 363(f)(1) pursuant to applicable non-bankruptcy law. *See*, 11 U.S.C. § 363(f)(1). Applicable nonbankruptcy law permits the sale of the assets free and clear of such interest. *See e.g., In the Matter of Spanish Peaks Holdings II, LLC*¸872 F.3d 892 (9th Cir. 2017) ("Section 363(f)(1) does not require an actual or anticipated foreclosure sale. It is satisfied if such a sale would be legally permissible") (holding that, under Montana law, a foreclosure sale to satisfy a mortgage terminates a subsequent lease on the mortgaged property, and, therefore, the sale free and clear of a lease was permitted under section 363(f)(1)). For example, under California law, a foreclosure sale of a personal property interest would terminate junior interests if conducted pursuant to the lien of a deed of trust, or an execution

sale pursuant to a judgment lien. Specifically, a junior lienholder in California could be compelled to accept a money satisfaction upon a senior secured party's disposition of collateral under the default remedies provided in §9617 of California's Uniform Commercial Code. Here, the Debtor has no preexisting secured debt, secured claims, or liens. Based on the foregoing, the Debtor submits that applicable non-bankruptcy law permits the sale of the assets free and clear of liens, claims and encumbrances.

## C.     <u>WAIVER OF THE STAY OF RULE 6004</u>

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise. For all of the reasons set forth above, the Debtor believes that borrowing on the DIP Loan terms and selling the accounts receivable as part of the factoring aspect of the DIP Loan is in the best interests of the Debtor's estate to bridge cash needs in June 2024. In order to facilitate the most expeditious closing possible, the Debtor requests that the order granting this Motion be effective immediately upon entry by providing that the fourteen-day waiting period of Bankruptcy Rule 6004(h) is waived.

## D.     <u>INTERIM RELIEF AND REQUEST FOR A FINAL HEARING</u>

Absent granting the relief sought by this Motion, the Debtor's business and estate will suffer serious harm, including, without limitation, the risk of facing immediate cessation of the Debtor's business operations, which, in turn, would greatly reduce the value of the Debtor's assets and thereby reduce, and likely greatly reduce, any potential recovery for unsecured creditors in this case. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, and otherwise finance its operations postpetition is essential to maintaining the going-concern value of the Debtor's business. The DIP Loan contemplated by this Motion is necessary to maintain business operations pending the Debtor's pursuit of a reorganization strategy for the benefit of all creditors and interest holders.

Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set the Motion for a final hearing, which will provide creditors and parties in interest with more than 14 days' notice after the service of this Motion and fix the time and date prior to the final hearing for parties to file objections to this Motion.

Case: 23-51520    Doc# 69    Filed: 07/10/24    Entered: 07/10/24 11:47:13    Page 19 of 86

# III. CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order in substantially the form as attached as **Exhibit 2** hereto:

1. Authorizing the Debtor to obtain postpetition financing up to the principal amount of $750,000 from BSC Investments, Inc. ("BSC"), as an administrative expense claim pursuant to 11 U.S.C. § 364(b) with 0% interest and a maturity date of August 31, 2024;

b. Authorizing the Debtor to obtain postpetition financing and factoring sale of accounts receivable up to the principal amount of $3,000,000 (the "DIP Loan") from Clear Coast Capital, LLC (the "Lender"), pursuant to the terms of a Factoring and Security Agreement (the "FS Agreement"), a true and correct copy of which is attached hereto as **Exhibit "1"**, to (a) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtor, (b) pay certain transaction fees, and other costs and expenses of administration of the Debtor's bankruptcy case (the "Case"), and (c) pay fees expenses owed to the Lender pursuant to the FS Agreement;

c. Authorizing and empowering the Debtor to execute and enter into loan documents (the "DIP Loan Documents") and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

d. Providing, pursuant to Sections 364(c), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents be and be deemed immediately secured (without any further filings) by valid, binding, continuing, enforceable, fully perfected, and unavoidable first senior priority security interests and liens (the "DIP Liens") in and on all prepetition and postpetition property and assets of the Debtor (the "Collateral"), provided, however, that the DIP Liens shall not extend or attach to, and the Collateral shall not include, causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 545, 547, 548, 549 and 550, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds

20

thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof;

e. Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Order;

f. Finding that adequate notice of the Motion has been provided to grant the Motion on an interim basis pending a final hearing;

g. Finding that immediate and irreparable harm would result if interim relief were not granted on an emergency basis to authorize the DIP Loan;

h. Waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Order;

i. Setting a final hearing on the Motion; and

j. Granting related relief that the Court deems just and proper under the circumstances of this Case.

Dated: July 10, 2024                               LEVENE, NEALE, BENDER, YOO
                                                             & GOLUBCHIK L.L.P.


                                                    By:    _/s/ John-Patrick M. Fritz_
                                                            RON BENDER
                                                            JOHN-PATRICK M. FRITZ
                                                    Counsel for Chapter 11 Debtor and Debtor in Possession

# EXHIBIT "1"

# FACTORING AND SECURITY AGREEMENT

This FACTORING & SECURITY AGREEMENT (the "*Agreement*") effective this Eighth day of July , 2024 (the "*Effective Date*") between BriteLab, Inc., a Delaware corporation, having its place of business at 6341 San Ignacio Ave., San Jose, CA 95119 (the "*Seller*"), and ClearCoast Capital, LLC, its affiliates, successors and/or assigns, as their interests may appear, having its place of business at 840 Lowcountry Blvd., Mount Pleasant, SC 29464 (the "*Purchaser*" and collectively with the Seller, the "*Parties*" or singularly a "*Party*").

**PURCHASHER IS A LICENSED CALIFORNIA LENDER, AND THE FINANCING PROVIDED UNDER THIS AGREEMENT IS PURSUANT TO CALIFORNIA FINANCE LENDERS LAW, DIVISION 9, SECTION 22000, *ET SEQ.* THIS FINANCING UNDER THIS AGREEMENT MUST BE USED BY THE SELLER FOR BUSINESS PURPOSES ONLY.**

**SERVICING NOTICE**: This Agreement shall be serviced by SouthStar Capital, LLC and its affiliates (collectively, "SouthStar") pursuant to a portfolio servicing agreement, and SouthStar is authorized to perform and carry out all of Purchaser's activities and rights under this Agreement, including – but not limited to – sending notices of assignment, contacting Account Debtors, collecting and remitting payments and Charges and engaging in collection activities to recover amounts owed.

FINANCING CONTINGENCY. The Parties acknowledge and agree that an absolute condition precedent to the Purchaser agreeing to advance funds to the Seller under the Factoring Agreement is the Bankruptcy Court entering an order granting the Purchaser a first priority senior secured security interest in the Collateral of the Seller.

As evidenced by the Parties' signatures below, and in consideration of the obligations as set forth in this Agreement and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. FACILITY AMOUNT. The total outstanding funds advanced by Purchaser to Seller under this Agreement shall not exceed Three Million and 00/100 Dollars ($3,000,000.00) (the "*Facility Amount*"), and Purchaser may reduce or increase this Facility Amount in its sole discretion without notice to the Seller. Any capitalized terms used in this Agreement and not specifically defined herein shall have the meaning given to the term in the Uniform Commercial Code (the "*UCC*").

2. PURCHASE OF ACCOUNTS. Seller may tender to Purchaser some or all of its Accounts, and Payment Intangibles arising therefrom, whether or not earned by performance: (i) for property that has been or is to be sold, leased, licensed or assigned; (ii) for services rendered; or (iii) as otherwise defined in the UCC. Seller may provide specific Accounts or a schedule of Accounts for purchase, and the Purchaser, in its sole and absolute discretion, shall have the right to purchase all or a portion of the Accounts. All of Seller's said Accounts, irrespective of whether they are purchased by Purchaser, are referred to as an "*Account*" or "*Accounts*." The payor of the Accounts are "*Account Debtors*."

Seller Initials:    *A B*    SignNow e-signature ID: 497208c01a...
SignNow e-signature 07/08/2024 18:06:07 UTC
07/08/2024 23:10:08 UTC

*[ClearCoast Non-Recourse Factoring and Security Agreement]*

- 1 -

**3.** **PAYMENT TO SELLER FOR ACCOUNTS.** Purchaser will evidence its agreement to purchase Accounts by the issuance of a check, wire or other electronic transfer to Seller in an amount up to eighty-five percent (85%) of the face amount of each Account, or such lesser percentage as Purchaser deems necessary in its permitted discretion (the "*Purchase Price*"). The Accounts that are purchased are referred to as "*Purchased Accounts*," and the purchase and sale of a Purchased Account represents a true sale. Seller shall deliver the invoices relating to Purchased Accounts to Purchaser, and at such time, the Purchased Accounts shall be deemed sold and assigned to Purchaser without any further assignments or documentation being required. Seller agrees to sell Accounts in an amount not to be less than thirty percent (30%) of the Facility Amount for each quarterly period after the Effective Date, calculated on the face value of the Purchased Accounts (the "*Minimum Amount*").

**4.** **INVENTORY ADVANCES.** [RESERVED].

**5.** **PURCHASE ORDER ADVANCES.** Purchaser, in its sole and absolute discretion, shall have the right to advance funds up to eighty-five percent (85%) of the face value of any purchase orders received from its Account Debtors that shall become eligible Purchased Accounts ("*Purchase Orders*"). Seller shall be required to provide all the necessary documentation and information regarding the Purchase Orders, the Account Debtors and the vendors that is requested by the Purchaser so that it can determine, in its sole discretion, the eligibility of the Purchase Orders to be financed.

**6.** **CHARGES, OTHER FEES & REPAYMENT.**

a. *Purchased Accounts Charges.* In consideration of the purchase of said Purchased Account(s), and in further consideration of Purchaser purchasing the Purchased Account(s), Seller agrees to pay Purchaser an amount equal to two and 15/100 percent (2.15%) of the face amount thereof for the first thirty (30) day period after payment for such Account is presented to Purchaser for sale, plus zero and 85/100 percent (0.85%) for each additional ten (10) day period or part thereafter, calculated from the date of purchase until payments received by Purchaser in collected funds on said Purchase Account(s) equals the Purchase Price of the Purchased Account(s) plus all Charges, Fees and other accruals due to Purchaser from Seller. An additional one and 00/100 percent (1.00%) per ten (10) day period will be charged for Invoices exceeding ninety (90) days from advance date. In no event shall the Purchased Account Charges be less than twenty-five and 00/100 dollars ($25.00).

b. *Inventory Advance Charges.* [RESERVED].

c. *Purchase Order Advance Charges.* In consideration of the advances that Purchaser makes on Purchase Orders, Seller agrees to pay Purchaser an amount equal to three and 65/100 percent (3.65%) of the amount of the advance for the first thirty (30) day period after date for such advance made to Seller's vendor or Seller, at Purchaser's discretion, on such Purchase Order, plus one and 25/100 percent (1.25%) for each additional ten (10) day period or part thereafter, calculated from the date of the advance until payments received by Purchaser on said Purchase Order equals the amount of the advance, plus all Charges, Fees and other accruals due to Purchaser from Seller.

Seller Initials: *A. B.*

SignNow e-signature ID: d8c634bf49...
SignNow e-signature ID: 0768882844x9
07/08 2024 23:06:07 UTC
07/08/2024 23:10:08 UTC

d. *Additional Advance Charges*. [RESERVED].

e. *Credit Insurance Charges*. Seller further agrees in consideration for the Purchased Accounts that Seller will pay an amount equal to Zero Point Three Five percent (0.35%) of the face amount thereof that includes insuring the risk, transmitting, and performing certain data processing services with respect to the maintenance and servicing of the Purchased Accounts.

f. *Transfer Charges*. Seller further agrees in consideration for the Purchased Accounts that Seller will pay an amount equal to Twenty-Five and 00/100 Dollars ($25.00) for each domestic wire, ACH, Real Time Payment or other electronic transfer or Fifty and 00/100 Dollars ($50.00) for each international wire or other electronic transfer.

All charges payable by Seller to Purchaser as set forth in <u>Subsections a. through f.,</u> above, are collectively referred to as "***Charges***."

g. *Misdirected Payment Fee*. Seller agrees that Purchaser may charge, in its sole discretion, a misdirected payment fee of Fifteen Percent (15%) of the face amount of any misdirected Account in violation of <u>Paragraph 14(b) or (c)</u> ("***Misdirected Payment Fee***") in order to compensate Purchaser for the administrative and loss of Collateral costs related to Misdirected Payments; <u>provided</u> <u>however</u>, the Purchaser will not charge a Misdirected Payment Fee if Seller complies with the reporting and repayment covenant in <u>Paragraph 14(c)</u>.

h. *New Account Debtor Fee*. Seller further agrees in consideration for the Purchased Accounts that Seller will pay a transactional administrative fee in the amount of Fifty and 00/100 Dollars ($50.00) for each new Account Debtor submitted that includes any handling, collecting, mailing, quality assuring, assessing the risk, transmitting, and performing certain data processing services with respect to the maintenance and servicing of the Purchased Accounts.

i. *MCA Fee*. In the event that the Seller takes funding from a merchant cash advance entity (an "***MCA***"), which is prohibited under this Agreement, the Seller agrees that Purchaser may charge, in its sole discretion, an MCA fee that will be an additional One Percent (1%) to all of the Charges.

j. *Minimum Fee*. Seller agrees that if Purchaser has not purchased the Minimum Amount, Seller agrees to pay to Purchaser, on demand, an additional amount equal to what the Charges would have been on the Minimum Amount over the applicable period, based on a 31-day month, less the actual Charges paid by Seller to Purchaser during that period (the "***Minimum Fee***").

k. *Early Termination Fee*. Should this Agreement be terminated by the Seller for any reason whatsoever, or by the Purchaser due to a Default, prior to the expiration of the Term, Seller shall pay the Purchaser an early termination fee equal to fifty percent (50%) of the monthly Charges that would have accrued on the Minimum Amount, based on a 31-day month, multiplied by the number of months that remain on the Term (the "***Early Termination Fee***").

l. *Dispute Fee*. Should the Purchaser be required to expend any out-of-pocket expenses and costs in connection with any dispute or collection activity relating to or arising out

Seller Initials: *A B*

SignNow e-signature ID: 606c84d8b8...
07/08/2024 23:09:07 UTC
SignNow e-signature ID: ...
07/08/2024 23:10:08 UTC

*[ClearCoast Non-Recourse Factoring and Security Agreement]*

of this Agreement, including – but not limited to – costs of monitoring the Collateral, collecting against Collateral and legal fees and expenses expended relating to this Agreement, the Purchaser shall be entitled to add an additional Forty Percent (40%) to such expenses and costs as an administration fee to compensate the Purchaser for its administrative efforts (the "*Dispute Fee*").

      m.  *Default Fee*. In addition to the Charges and other fees, upon a Default, Seller shall pay an additional charge of Twenty-One Percent (21%) simple interest calculated per annum on a 360-day year based upon the principal amount of funds due to the Purchaser on the date of the Default (the "*Default Fee*").

      The fees payable by Seller to Purchaser as set forth in <u>Subsections g. through m.</u>, above, are collectively referred to as "*Fees*."

      n.  *Repayment to Purchaser*. The Purchase Price, Additional Advances, the Charges, the Fees and other accruals provided for under the Factoring Documents (as defined herein), will be repaid in the ordinary course through the collection of funds from the Accounts, whether purchased or unpurchased.  Purchaser is authorized to affix Seller's signature and send Notices of Assignment to all the Account Debtors of Seller in order to satisfy repayment of all amounts owed.  Funds from the Accounts are considered "*collected*" five (5) days after receipt of funds by Purchaser (assuming such funds are in fact collected).   Additional Advances may also be repaid through applying Accounts against all or a portion of the Additional Advances by making them Purchased Accounts.

      o.  *Seller Representation*.  Seller acknowledges and agrees that the Charges and Fees set forth in this <u>Paragraph</u>, and all other fees and obligations payable by the Seller under this Agreement are reasonable and valid under South Carolina law and negotiated between the Parties that are sophisticated commercial transactions.  Moreover, the Seller acknowledges and agrees that the transactions under this Agreement reflect a true sale of the Accounts.

      **7.**    <u>R**EMITTANCE TO** S**ELLER**</u>**.**  On the Friday of the week following the receipt of the funds for Payment Intangibles of the Accounts, the Purchaser shall transfer to Seller an amount equal to the difference between the amount of aggregate receipt of funds on the Accounts, <u>minus</u> the sum of any of the following: (a) the aggregate Purchase Price of the Purchased Accounts; (b) any outstanding advances for Additional Advances, Purchase Orders, Inventory or other amounts owing under the Factoring Documents; (c) all Charges; (d) all fees, (d) other accruals provided for under this Agreement; (e) any Reserves; (f) any chargebacks; plus (g) all other obligations and accruals under any purchase order financing addendum, inventory financing addendum, any other addenda, a promissory note or line of credit, a leasing agreement or any other agreement between the Purchaser, the Seller and their affiliates (collectively with this Agreement, the "*Factoring Documents*").  The amount of the remittance under the preceding sentence shall be deemed correct, proper and accepted by Seller, unless Seller contests in writing the remittance or any calculation underlying the remittance thirty (30) days following the end of the month when such remittance was made. If Seller does not timely contest remittance amount within thirty (30) days, then Seller agrees to waive, release and forfeit any claim that the amount of remittance is incorrect or otherwise improper.

Seller Initials: *A  B*

SignNow e-signature ID: 2c4c42dccd...
SignNow e-signature 07/08/2024 23:06:07 UTC
07/08/2024 23:06:07 UTC
07/08/2024 23:10:08 UTC

**8. GRANT OF SECURITY INTEREST.** As security for the payment and performance of all Seller's present and future obligations to Purchaser under this Agreement, or otherwise for the payment and performance of any obligation owed to Purchaser by Seller pursuant to any other agreement or instrument, Seller hereby transfers and grants to Purchaser a first priority security interest in all of Seller's presently-owned and hereafter-acquired personal and fixture property, wherever located, including, the property set forth in Exhibit A and in any additional property listed in Exhibit B. The property listed in Exhibits A and B is collectively referred to as the "*Collateral.*" The Collateral specifically includes, without limitation, Sellers' right to any and all returned or repossessed personal property from Account Debtors and also shall include all rights of replevin, reclamation, and stoppage in transit and all rights as a seller of goods. Seller agrees to reimburse Purchaser for actual costs relating to UCC and other filings necessary to perfect its security interests.

**9. PURCHASER'S RIGHTS.** Seller hereby authorizes and approves Purchaser to do the following: (a) file UCC-1s and other financing statements and documents, whether or not executed by Seller, in order to perfect its security interest in the Collateral ("*Financing Statements*"), and the Seller further ratifies the filing of such Financing Statements or other documents filed by Purchaser prior to the execution of this Agreement; (b) to affix and sign Seller's signature to notifications under Section 9-406 of the UCC (a "*Notice of Assignment*") and send Notices of Assignment to all the Account Debtors of Seller directing them to remit payment on Accounts directly to Purchaser; (c) to communicate directly with Account Debtors to verify the amount, validity or any matter relating to any Account; and (d) charge back aged Accounts and substitute with other Accounts, proceeds from other Collateral, apply payments from other Accounts, amounts in escrow, or the Reserve Account. Once a Notice of Assignment is sent to an Account Debtor, the Seller shall indicate on the invoices reflecting the Accounts that Purchaser is the assignee of the account and Purchaser's address and banking information so remittances can be made directly to Purchaser. Unless the non-payment of a Purchased Account is due to the insolvency of the Account Debtor, Purchaser shall have the right to require the Seller to repurchase a Purchased Account if it remains unpaid after payment due date set forth on the invoice, and if not repurchased, Purchaser shall have the right to charge back the Purchased Account after ninety (90) days after the invoice date. The Purchaser shall not be obligated, nor shall Seller be authorized, to release any Financing Statements, Notice of Assignments or other security interests granted to Purchaser unless Seller has satisfied all of its obligations to Purchaser under this Agreement, and Seller has executed a general release in favor of the Purchaser. If the Seller creates and begins to conduct business through an alter-ego or nominee, the Purchaser is authorized to take the actions authorized and approved by this Paragraph with regard to the alter-ego or nominee. With regard to Accounts, Seller authorizes the Purchaser on behalf of the Seller to compromise or extend the time for payment related to any Account upon such terms as Purchaser may determine and to demand, collect, receive and sue for any and all amounts due or to become due on the Accounts, and execute lien waivers related to any Accounts. The provisions contained in this Paragraph are a material inducement for execution of this Agreement by Purchaser.

**10. ESCROW AND RESERVE ACCOUNT.** Purchaser may give notice to Seller that it intends to proportionally increase its security due to a condition or event increasing the credit risk, which may be due to: (a) an Account Debtor fails to pay on a Purchased Account when due; (b) any Additional Advance, Inventory advance or Purchase Order advance remains outstanding

Seller Initials: *A B*

SignNow e-signature ID: 076c417eed...
SignNow e-signature ID: 09520263b0cc7c1f17b...
05/24/2023 03:10:03 UTC

*[Non-Recourse Factoring and Security Agreement]*

for more than ninety (90) days; (c) a material change to the credit risk of an Account or Account Debtor; (d) an Account or Account Debtor will violate the Purchaser's underwriting standards; (e) the Seller's financial position has deteriorated; (f) an increased risk exists that Seller will default on any obligation whether under this Agreement; (g) a legal or indemnity risks exists related to the Factoring Documents that may require Purchaser to fund a liability and/or legal expenses and costs; (h) the Seller is in Default of this Agreement or any other Factoring Documents, or (i) any other condition or event increasing the credit risk to the Purchaser. If the Seller fails to resolve such condition or event to Purchaser's satisfaction, the Purchaser may, in its sole discretion, establish a reserve or escrow from the Accounts, remittances due to the Seller under <u>Paragraph 7</u>, payments received from Account Debtors or other proceeds received by Purchaser (a "*Reserve Account*"). In addition to establishing a Reserve Account, the Purchase may, in its sole discretion, reduce the Purchase Price, reduce the amount of advances against Inventory or Purchase Orders, refuse to purchase Accounts, refuse to make advances on Inventory or Purchase Orders, refuse to make Additional Advances, or affix seller's signature and send Notices of Assignment to all the Account Debtors of Seller.

**11.** **INSURANCE.** Purchaser may require Seller, at Seller's sole expense, to carry reasonable insurance in such coverages and amounts for the protection of credit exposure and its Collateral that the Purchaser deems adequate. At a minimum, Seller shall carry a comprehensive commercial general liability insurance policy with minimum limits of at least $1,000,000.00 for bodily injury for each person and $2,000,000.00 per occurrence and property and casualty damage of $1,000,000.00 each occurrence. Any insurance policies shall name Purchaser as an additional insured, a loss payee, a certificate holder and/or a mortgagee, and a certification of insurance shall be provided to the Purchaser evidencing that Purchaser is an additional insured, a loss payee, a certificate holder and/or a mortgagee. The Seller agrees that none of the insurance policies required under this Paragraph shall be cancelable without the insurance company giving notice to the Purchaser. If Seller fails to acquire any insurance required by this Paragraph, Purchaser may, at its option, cause such insurance to be issued, and in such event, Seller agrees to pay the premium for such insurance as a Charge or through the establishment of a Reserve.

**12.** **TERM & REINSTATEMENT.**

a. *Term of Agreement.* This Agreement shall be for a term of thirty-six (36) months from the first day of the month following the date when the first Purchased Account is purchased (the "*Initial Term*"). Unless terminated by Seller by providing written notice to Purchaser as required by <u>Paragraph 21</u> not less than sixty (60) but not more than ninety (90) days before the end of the Initial Term, this Agreement shall automatically extend for an additional thirty-six (36) months (the "*Renewal Term*"). Seller shall be required to provide the same notice during any and all Renewal Terms as set forth in the preceding sentence in order to terminate this Agreement, and if no notice is provided, the Agreement shall extend for an additional Renewal Term. All Renewal Terms and the Initial Term are collectively referred to as the "*Term*." In no event shall the Term expire prior to all of Seller's obligations to Purchaser under this Agreement being satisfied, and the Term will be extended until such time.

b. *Reinstatement.* Notwithstanding any termination of this Agreement, Seller hereby agrees that to the extent Purchaser receives any payment(s) from Seller on account of Seller's obligation to Purchaser hereunder, and such payment(s) are subsequently invalidated, declared

- 6 -

Seller Initials: _A_ _B_

SignNow e-signature ID: c3f531e2c4...
SignNow e-signature ID: 38935628fd73117...
0531202003:10:09 UTC

*[Non-Recourse Factoring and Security Agreement]*

to be preferential and/or required to be restored, returned or repaid to a trustee, receiver, or any other party upon any bankruptcy, insolvency, dissolution or liquidation of Seller, then to the extent of such invalidated payment(s), that portion of Seller's obligation hereunder intended to be satisfied thereby shall be deemed revived as if such payments(s) had not been received by Purchaser and all Purchaser's rights and remedies under this Agreement shall be and remain applicable and in full force and effect.

13. **REPRESENTATIONS & WARRANTIES FOR ACCOUNTS.** To induce Purchaser to purchase Accounts during the Term, Seller represents and warrants to its knowledge regarding each Purchased Account that: (a) Seller is the sole and absolute owner of each Purchased Account and has full legal right to make said sale, assignment and transfer thereof hereunder; (b) The correct amount owed on each Purchase Account is as set forth on the invoice tendered for sale and such amount is not in dispute or partially paid; (c) The payment of each Purchased Account is not contingent upon the fulfillment of any obligation or condition, past or future, and any and all obligations required of the Seller with regard to such Account have been fulfilled by Seller; (d) Each Purchased Account is based on an actual sale and delivery of goods and/or services actually rendered for which an invoice has been tendered to the Account Debtor and is presently due and owing to Seller; (e) All invoices with respect to Purchased Accounts shall state that the Account is payable to Purchaser at Purchaser's address or banking information; (f) The Purchase Account has not been previously sold, assigned, transferred or pledged by the Seller and is free of any encumbrance or lien; (g) The Account Debtors have no defenses, offset, recoupment's, or counterclaims with respect to the payment of the Purchased Accounts; and (h) any officer, director, member, manager, employee, agent or other representative of a Seller who presents Accounts for purchase is authorized to tender such Accounts for sale.

14. **SELLER'S AFFIRMATIVE COVENANTS.** To induce Purchaser to purchase Accounts during the Term, Seller affirmatively covenants that: (a) Seller will not tender any invoices that are materially false; (b) Seller will not directly or indirectly contact any Account Debtor and influence them from making payment directly to Purchaser over a Notice of Assignment; (c) Seller will not retain any payments received directly from an Account Debtor that has received a Notice of Assignment and agrees that any breach of this covenant will constitute conversion and/or theft of Purchaser's property; provided however, if Seller, of no fault of its own, receives a payment on an Account over a Notice of Assignment, and reports that it received the misdirected payment within twenty-four (24) hours of receiving payment, and returns the payment to the Purchaser within forty-eight (48) hours, no breach of this covenant will occur; (d) Seller will not sell, transfer, pledge, grant a security interest in or hypothecate any of its Accounts or other Collateral to any other person or entity other than Purchaser, including – but not limited to – an MCA; (e) Seller shall not compromise or settle an Account or otherwise modify the repayment terms of any Account; (f) Seller shall not enter into any financial arrangement with MCA or other entity that collects repayment by debiting a deposit account of the Seller; (g) Seller shall provide the Purchaser access to all Account Debtor portals, software or other management systems in order to monitor the Accounts, Inventory or Purchase Orders; (h) Seller shall contemporaneously maintain true and accurate information and books and records related to its Accounts, Inventory and Purchase Orders; (i) Seller shall remain in good standing as a legal entity under all applicable laws; (j) Seller shall stay current with its tax reporting and payment obligations to the Internal Revenue Service and all other state or local taxing authority; (k) Seller shall not form or create any alter egos or nominee entities; (l) Seller shall notify Purchaser if its

Seller Initials: _A_ _B_

SignNow e-signature ID: 26c7a1d92f...

SignNow e-signature ID: 079229940286f070c43f... *[Non-Recourse Factoring and Security Agreement]*
05/18/2023 03:10:03 UTC

ownership, either directly or indirectly, changes by more than ten percent (10%); and (m) Seller shall provide notice to Purchaser within ten (10) business days of changing to the legal name of the Seller, relocating the principal place of business of a Seller, redomiciling the Seller to another state, or converting the legal classification of the Seller.

15. <u>REPORTING REQUIREMENTS</u>. Before the tenth (10th) day of the following month, the Seller agrees to provide to the Purchaser a monthly profit and loss, balance sheet and cash flow statements, accounts receivable aging report for the Accounts, accounts payable aging reports, inventory reports for finished goods, inventory reports for non-finished goods, bank statements and other financial information reasonably requested by Purchaser. Once completed, Seller agrees to provide reviewed or audited annual and/or quarterly financial statements, if applicable, and income tax returns, payroll tax returns, and proof of payment of its tax liabilities to Internal Revenue Service or other state or local revenue agency, whether paid with the returns. With regard to online, software or other electronic access, Seller shall also provide unlimited access to: (i) Seller's bank accounts through the Clarilogic, Inc d/b/a DecisionLogic software; (ii) online viewing access to all of Seller's bank accounts; and (iii) provide logins for all Seller's financial, accounting, purchase order and inventory management software. In addition, Seller shall promptly respond to all requests made by the Purchaser's accountancy firm in connection with any audits, reviews and other financial services provided to the Purchaser. In the event Seller fails to comply with the reporting requirements of this Paragraph, the Purchaser may impose a Two Hundred Fifty and 00/100 Dollar ($250.00) weekly penalty against the Seller for non-compliance, but the imposition and payment of such penalty shall not be a cure of any Default for the Seller's failure to comply with this Paragraph.

16. <u>DEFAULT</u>. A Default shall occur under this Agreement after Purchaser provides notice to Seller of the existence of any of the following events and conditions, and Seller fails to cure such event or condition in five (5) business days of the notice; <u>provided</u> <u>however</u>, no notice and cure period shall exist for a Default for violating the covenants in <u>Paragraph 14(a) through (c)</u>. The uncured occurrence of any of the following events shall constitute a "*Default*": (a) Seller fails to repay any Additional Advances within ninety (90) days of the Additional Advance being made; (b) Twenty-Five Percent (25%) or more of the face value of the Purchased Accounts have aged ninety (90) days without repayment; (c) Seller fails to pay any Charges, Fees or other amounts owing under this Agreement; (d) Any of the representations and warranties in <u>Paragraph 13</u> are untrue; (e) Seller fails to adhere to and comply with the affirmative covenants in <u>Paragraph 14</u>; (f) Seller fails to provide the information as required in <u>Paragraph 15</u>; (g) Seller ceases to do business as a going concern; (h) If not a debtor in possession financing, the institution of bankruptcy or insolvency proceeding involving the Seller; (i) An unsubordinated tax lien is filed against Seller in an amount greater than $10,000.00; (j) A judgment is entered against Seller which is not promptly satisfied or if a levy or attachment shall be filed against Seller or the Collateral; or (k) Purchaser reasonably deems itself insecure in its expectation that Seller will fully perform all of its obligations under this Agreement.

Upon the occurrence of Default under this Agreement, an event of default shall be deemed to have occurred under any and all the Factoring Documents, and upon the occurrence of Default under any of the Factoring Documents, an event of Default shall be deemed to have occurred under this Agreement. Purchaser, in its sole discretion, shall be entitled to assert any and all rights and remedies against the Seller, its affiliates, alter-egos and nominees, and collect against

Seller Initials: *A B*

SignNow e-signature ID: bccb097abe...
SignNow e-signature ID: 09908104... [*...Non-Recourse Factoring and Security Agreement*]
05/14/2023 03:10:05 UTC
05/14/2023 03:10:05 UTC

any and all collateral, property or guaranty as provided for under this Agreement or the Factoring Documents. This Paragraph is specifically intended by the Parties to be a cross-collateralization and cross-default provision so the collection rights, Collateral and other property set forth in one agreement secures all the debts and obligations of the other agreements, and vice-versa.

17. R<small>EMEDIES</small>. In the event a Default, Purchaser may, in its sole discretion, assert any or all of the following remedies: (a) immediately terminate this Agreement and all amounts due and owing under this Agreement shall immediately become due and payable without notice and presentment; (b) in addition to all other Charges, Fees and all other amounts provided for under this Agreement, charge the Default Fees; (c) satisfy the obligations owing under this Agreement from the Reserve Account; (d) file any Confessions of Judgment; (e) affix Seller's signature and send Notices of Assignment to all the Account Debtors of Seller; (f) take possession of Collateral with or without judicial process; (g) assert any rights as provided for under the applicable UCC and other South Carolina laws; (h) seek to place the Seller into receivership, or other applicable state law process, and request a court to appoint a receiver over the Seller, and Seller will not contest and consent to the appointment of a receiver; (i) enter onto the real property or leased premises of the Seller to take control of the Collateral; (j) notify and require the U.S. Post Office to deliver Seller's mail to Purchaser, access Seller's post office or other mail boxes, and receive, accept, open, dispose of and redirect any mail; (k) take and endorse for deposit in the name of Seller all payments received for any of Seller's Accounts and to deposit same for benefit of Purchaser; (l) Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account of Seller, and the Seller agrees to be bound by the ACH rules set forth by the National Automated Clearing House Association (the "*NACHA*"); (m) continue to assert all rights provided for under Paragraph 15 or otherwise granted under this Agreement; and (n) revoke and deny Seller access to ClearCoast's factoring software or other reporting systems. Purchaser shall have no obligation to marshal any assets in favor of Seller.

18. A<small>DDITIONAL</small> P<small>ROVISIONS</small>. [RESERVED].

19. P<small>OWER OF</small> A<small>TTORNEY</small>. Seller hereby irrevocably appoints and authorizes any officer or employee of Purchaser to act as the attorney-in-fact for Seller in order to enforce its rights and remedies set for in this Agreement or the other Factoring Documents, which includes – but is not limited to – (a) the acts set forth in Paragraphs 9 and 17; (b) endorsing Seller's name upon notes, checks, drafts, money orders or other instruments; (c) signing and affixing Seller's name on any invoice, pay app, lien waiver or satisfaction, freight bill, bill of lading storage or warehouse receipt, or other instrument or document in respect to any Account; and (d) in Seller's name, demanding, making claims, suing, collecting, granting extensions, compromising, discharging and entering into releases for all matters related to this Agreement and the Factoring Documents. The power of attorney granted to Purchaser in this Paragraph is coupled with an interest and is irrevocable while this Agreement is in place and effect.

20. I<small>NDEMNITY</small>. Seller agrees to indemnify and hold Purchaser harmless from all losses, causes of action, claims, proceedings or other liability asserted against Purchaser subsequent to the Effective Date related to or arising from this Agreement or the Factoring Documents, including reasonable legal fees and costs incurred by Purchaser in defense thereof.

Seller Initials: _A   B_

SignNow e-signature ID: 3792927360...
SignNow e-signature ID: 3792927360...
05/31/2023 03:10:05 UTC

[ClearCoast *Non-Recourse Factoring and Security Agreement*]

21.    NOTICES.  Notices required or permitted hereunder shall be in writing and shall be given by: (a) personal delivery, (b) email with a copy of such notice sent by overnight delivery with a reputable nationally recognized carrier, (c) overnight delivery with a reputable nationally recognized carrier, or (d) certified mail, postage prepaid.  Notices sent shall be deemed given when delivered or mailed to the addresses set forth in the preamble or to the registered agent for a Party.  Either Party shall have the right to change its address by notice as herein provided.

22.    GOVERNING LAW, VENUE & ATTORNEYS' FEES.  This Agreement, the Factoring Documents, or any matters related to or arising from this Agreement or the Factoring Documents, shall be interpreted, construed, and governed by and under the laws of the State of South Carolina, without regard to conflicts of law rules principles (whether of the State of South Carolina or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Carolina. This South Carolina choice-of-law provision specifically applies to any claim made by Seller under usury laws. In the event that any dispute whatsoever arises between the Parties related to or arising from this Agreement (a "*Dispute*"), the Dispute shall be brought exclusively in courts of competent jurisdiction in the State of South Carolina, County of Charleston, and the Parties irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Charleston, South Carolina waiving any argument as to *form non-conviens*; provided however, the Purchaser may seek injunctive relief, a receivership or other equitable relief in another jurisdiction that is deems more appropriate in the Purchaser's sole discretion.  Seller shall be liable for all attorney's fees and all other costs and expenses incurred by Purchaser related to or arising from this Agreement or the Factoring Documents.

23.    JURY TRIAL WAIVER.  **IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL AND, TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SOUNDING IN CONTRACT OR TORT OR OTHERWISE ARISING FROM OR IN ANY WAY RELATED TO THIS AGREEMENT, THE FACTORING DOCUMENTS, OR DEALINGS OF THE PARTIES WITH RESPECT THERETO, AND EACH PARTY FURTHER WAIVES AND FORFIETS ANY RIGHT TO CONSOLIDATE WITH ANOTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.**

Seller Acknowledgment:   *A  B*

SignNow e-signature ID: 7f06e6456c...
SignNow e-signature ID: 38aed0dbc7...
07/08/2024 23:06:07 UTC
07/08/2024 23:10:08 UTC

24.    LIMITATION OF LIABILITY.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE SELLER SHALL NOT ASSERT AND HEREBY WAIVES, FORFEITS AND RELEASES ANY CLAIM AGAINST THE PURCHASER UNDER ANY LAW, STATUTE OR THEORY OF LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE FACTORING DOCUMENTS OR ANY OTHER DOCUMENT CONTEMPLATED HEREBY FOR (A) SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES); AND (B) ANY LOSS, DAMAGE OR INJURY TO EARNINGS, PROFITS OR GOODWILL OF THE SELLER. IN NO EVENT SHALL THE LIABILITY OF PURCHASER TO THE SELLER, IN THE AGGREGATE, EXCEED THE AMOUNT OF FEES AND CHARGES ACTUALLY PAID TO PURCHASER BY THE SELLER FOR THE TWELVE (12) MONTH**

Seller Initials:   *A  B*

SignNow e-signature ID: 38aed0dbc7...
SignNow e-signature ID: 7f06e6456c...
07/08/2024 23:10:08 UTC
07/08/2024 23:06:07 UTC

*[Master Non-Recourse Factoring and Security Agreement]*

**PERIOD IMMEDIATELY PRIOR TO THE DATE SUCH CLAIM AROSE OTHER THAN LIABILITY OF THE PURCHASER DUE TO FRAUD. NOTHING IN THIS PARAGRAPH SHALL BE CONSTRUED TO RELIEVE OR LIMIT THE LIABILITY OF THE SELLER OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY PURCHASER AS PROVIDED IN <u>PARAGRAPH 20</u> AGAINST ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST THE PURCHASER BY A THIRD PARTY.**

Seller Acknowledgment:

SignNow e-signature ID: ef87bdd13e...
SignNow e-signature ID: 07/08/2023:06:07 UTC
07/08/2024 23:10:08 UTC

25.     <span style="font-variant:small-caps">Bankruptcy Waiver; Consent to Filing.</span>  [RESERVED].

26.     <span style="font-variant:small-caps">Assignment by Purchaser.</span>  Purchaser, without notice to Seller, may assign, transfer and/or pledge all of Purchaser's rights under this Agreement or the Factoring Documents to an affiliate, Purchaser's lender and/or any third party (an "*Assignee*").  The Seller further acknowledges and agrees that the Assignee will acquire and assume all interest and rights to payments, enforcement of obligations and claims, and will act in the stead of the Purchaser in every regard whatsoever with respect to this Agreement and the Factoring Documents. Seller hereby consents to any such assignment, transfer and/or pledge and agrees that in such event, upon request of Assignee, it will render all acts, performance, and payment directly to Assignee, and that said Assignee shall have all of Purchaser's rights hereunder.  The Seller expressly agrees and acknowledges the validity of any future assignment, transfer or pledge to an Assignee without the prior written consent of and without giving notice to the Seller.

27.     <span style="font-variant:small-caps">No Waiver.</span>  Waiver by Purchaser of any Default under this Agreement or a breach of any warranty, representation, covenant or obligation herein shall not be construed as waiver of any subsequent breach or Default.  Failure by Purchaser to exercise any right or remedy hereunder shall not operate as a waiver of any subsequent breach or default.  All rights and remedies are cumulative and not alternative.

28.     <span style="font-variant:small-caps">Amendment.</span>  This Agreement contains the entire agreement of the Parties and supersedes, replaces and extinguishes any prior agreements between the Parties. This Agreement may not be modified except by a written agreement executed by Seller and Purchaser.

29.     <span style="font-variant:small-caps">Severability.</span>   If any provision of this Agreement is held or found to be illegal, invalid or unenforceable by any statute, regulation, rule, order or decree of any governmental authority, court, agency or exchange, such invalid provision shall be deemed deleted here from, and the Parties acknowledge and agree that any governmental authority, court, agency or exchange shall revise such provision to the minimum extent necessary to cure such violation.  All other provisions in this Agreement shall nevertheless continue to be binding on the parties hereto and shall be of full force and effect.

30.     <span style="font-variant:small-caps">Further Cooperation.</span>  The Parties agree to cooperate in good faith with one another in executing any amendments to this Agreement deemed necessary to confirm the intent of the Parties, including – but not limited to – correcting any clerical mistakes such as page numbers, typos, missing initials, etc., and each of the Parties agrees to execute and deliver such other and further instruments as may be necessary to implement fully the terms of this

Seller Initials:

SignNow e-signature ID: 85d277aaac...
SignNow e-signature ID: 07/08/2023:06:07 UTC
07/08/2024 23:10:08 UTC

*[Non-Recourse Factoring and Security Agreement]*

Agreement. The Parties further acknowledge and agree that the presence of clerical mistakes in the Agreement is not material and do not affect the enforceability of this Agreement.

      **31.**    AUTHORITY & ELECTRONIC SIGNATURES. All corporate action on the part of the Seller necessary for the authorization, execution and delivery of the Agreement and the performance of all obligations of the Seller hereunder have been taken prior to the execution of this Agreement. When executed and delivered by the Seller, this Agreement shall constitute valid and legally binding obligation of the Seller, enforceable against the Seller in accordance with its terms. By executing this Agreement, the Parties agree that the use of any electronic signatures is the legally binding equivalent of a handwritten signature and has the same validity and binding effect of a handwritten signature. The Seller further agrees that it will not, at any time, repudiate the validity of this Agreement or argue that its electronic signature is not legally binding. Seller will also not object to the admissibility of this Agreement in the form of an electronic record, the admissibility of a paper copy of an electronic version of the Agreement, or a paper copy of the Agreement bearing an electronic signature on the grounds that it is an electronic record or has an electronic signature that is not an original or not in its original form.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*
*[SIGNATURE PAGES TO FOLLOW]*

- 12 -

Seller Initials: *A B*

SignNow e-signature ID: 07c09e7417...
SignNow e-signature ID: 07c09e7417...
05/24/2023 03:10:05 UTC

*[Non-Recourse Factoring and Security Agreement]*

IN WITNESS WHEREOF, the undersigned does hereby execute this Agreement as of the date first above written.

**BRITELAB, INC.**
**(THE "SELLER")**

*Ali Bushehri*
_____
(Seller Signature)
BSC Investment Group, Inc.
Its: Sole Shareholder

By:     Ali Bushehri
Its:     Shareholder & Director

*Muninderpal SINGH Rekhi*
_____
(Seller Signature)
By: BSC Investment Group, Inc.
Its: Sole Shareholder

By:     Muninderpal Singh Rekhi a/k/a Bobby Rekhi
Its:     Shareholder & Director

*Ali Bushehri*
_____
(Seller Signature)
Its: Chairman & CEO

*Muninderpal SINGH Rekhi*
_____
(Seller Signature)
By: Muninderpal Singh Rekhi a/k/a Bobby Rekhi
Its: Director

*[Signature Page - ClearCoast Non-Recourse Factoring Agreement]*

**Seen & Acknowledged:**

**ClearCoast Capital, LLC
(the "Purchaser")**

_____
By:    Susan E. Linney
Its:    Authorized Person

## EXHIBIT A
### (Description of Collateral)

All Debtor's assets, now owned or hereafter acquired, including, without limitation, all of Debtor's presently owned and hereafter acquired personal and fixture property wherever located, including, without limitation, all accounts, goods, chattel paper, inventory, equipment, instruments, investment property, documents, deposit accounts, commercial tort claims, letters-of-credit rights, general intangibles including payment intangibles, patents, software, trademarks, tradenames, customer lists, supporting obligations, and all proceeds and products of all the foregoing, including without limitation, insurance proceeds, lock box contents, and proceeds (the "collateral"). The collateral specifically includes, without limitation, Debtor's rights to any and all returned and/or repossessed personal property from account Debtors and also shall include all rights of replevin, reclamation, stoppage in transit, and all rights as a seller of goods.

This serves as notice that pursuant to an agreement between Debtor and secured party, Debtor agreed not to grant a security interest in any of the above collateral to any other person without the express written permission of secured party or permit the repayment of any obligation to another person through the debiting of a deposit account or other account. Accordingly, the acceptance of any security interest by anyone other than the secured party or the debiting of Debtor's accounts is likely to constitute tortious interference with secured party rights, tortious interference of contract, or collusion.

In the event that any entity is granted a security interest in Debtor's accounts, chattel paper, or general intangibles contrary to the above, secured party asserts a claim to those accounts, chattel paper, general intangibles, and/or any proceeds thereof received by such entity.

**EXHIBIT B**
**(Additional of Collateral)**

| EQUIPMENT | QUANTITY | Serial Number(s) |
|---|---|---|
| DVT Stocker #1 | 1 | 70046043 |
| DVT Stocker #2 | 1 | E25-060XX |
| 200 MM Stocker | 1 | 70041139 |
| 300 MM Stocker | 1 | EO2-06208 |
| AL 4 Car | 12 | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |
| | | 70063177 |

| The components for the above equipment are: |
|---|
| Assy, Aeroloader IV |
| Communications Network, Aliv |
| Assy, Lift Fixture, Aliv |
| E84 Master and Slave Box Kit |
| Under Track Storage (UTS), Aliv |
| PDU, Track, Aliv, Norm Only |
| Assy, Gen 2 Turbo Stock AC PDU |
| Assy, Gen 2 Turbo Stock DC PDU |
| Mio, Turbo-Stocker |
| AT3 Half Inch Car, 300MM Foup |
| AT3 Half Inch Car, 200MM Foup |
| Assy, Station, Vertical, Half |
| AT3 Half Inch Car, 200MM, Smic & Tsmc Via Edsn |
| Turn Table, Half, AT3 |
| Horizontal Transfer 39.5In, Half, AT3 |
| Assy, Queue Node, Half, AT3 |
| Commkey |



THIS FACTORING AGREEMENT ATTESTATION ("Attestation") is executed as the date set forth above by **BRITELAB, INC.**, a Delaware corporation, with offices at 6341 San Ignacio Ave., San Jose, CA 95119 (the "Seller"), and the additional Responsible Parties of the Seller as set forth below.

WHEREAS, on 07/08/2024 _____, Seller entered into a Factoring and Security Agreement with ClearCoast Capital, LLC ("ClearCoast"), and all other addenda and transactional documents (collectively, the "Factoring Agreement");

WHEREAS, the following individuals are persons responsible for the finances of the company and the payment of invoices by the Account Debtors of the Seller: Ali Bushehri and Muninderpal Singh Rekhi a/k/a Bobby Rekhi (collectively with the Seller, the "Responsible Parties").

WHEREAS, under Paragraph 2 of Factoring Agreement; ClearCoast agreed to purchase "Accounts" from the Seller, and in connection with the purchase of the Accounts, Seller granted ClearCoast a perfected first priority lien in certain of its "Collateral" under Paragraph 8 of the Factoring Agreement;

WHEREAS, Seller permitted ClearCoast to notice its Account Debtors under Paragraph 9 of the Factoring Agreement so payment is made directly by the Account Debtors to ClearCoast, and ClearCoast will notice the Account Debtors with the Notice of Assignment that is attached hereto as **Exhibit 1**;

WHEREAS, ClearCoast requires the Responsible Parties to execute this Attestation affirming and acknowledging ClearCoast rights to issue the Notice of Assignments to its Account Debtors and the importance of the Notice of Assignment with regard to the factoring relationship; and

NOW THEREFORE, as evidenced by the signatures below, and in consideration of the obligations as set forth in the Factoring Agreement, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Responsible Parties attest as follows.

1.      All capitalized terms in this Attestation not specifically defined herein have the meanings given in the Factoring Agreement.

2.      The Responsible Parties acknowledge, understand and agree that:

a.      ClearCoast is authorized under Paragraphs 9 and 17 of the Factoring Agreement to affix the Seller's signature to the attached Notice of Assignment and issue the Notice of Assignment to certain of the Account Debtors of the Seller;

Case: 23-51520    Doc# 69    Filed: 07/10/24    Entered: 07/10/24 11:47:13    Page 39 of 86



b.      ClearCoast is permitted to issue the Notice of Assignment in order to secure its Collateral and Seller's repayment obligations under the Factoring Agreement, and after the Account Debtors receive the Notice of Assignment, the Account Debtors have a legal obligation under Section 9-406 of the U.C.C. to pay ClearCoast directly all Accounts of the Seller;

c.      If an Account Debtor pays you or any third party except for ClearCoast over a Notice of Assignment, the payment obligation of the Account Debtor is not satisfied and will expose the Account Debtor to multiple liability, and ClearCoast will be able to bring a payment over notice claim against the Account Debtor;

d.      The Responsible Parties will not; (i) influence an Account Debtor to make payment to the Seller or another third-person over the Notice of Assignment, (ii) interfere with an Account Debtor attempting to make payment to ClearCoast, (iii) represent to an Account Debtor that the Notice of Assignment is not proper or binding, or (iv) take any other action to impede ClearCoast's ability to receive payments from Account Debtors who have received a Notice of Assignment;

e.      If a Responsible Party receives payment directly from an Account Debtor, the Responsible Parties will immediately notify ClearCoast and turnover the payment to ClearCoast because a failure to do so is a breach of the Factoring Agreement and is a conversion of ClearCoast's Collateral; and

f.      A failure of any Responsible Party to adhere strictly to this Attestation shall be a breach of the Factoring Agreement, and ClearCoast will have the right to pursue all legal claims and actions against the Responsible Parties, Seller and Account Debtors.

3.      The Responsible Parties acknowledge, understand and agree that ClearCoast may present this Attestation to Account Debtors in order to persuade them to make payment directly to ClearCoast in accordance with the Notice of Assignment, and the Responsible Parties shall not communicate anything to an Account Debtor inconsistent with this Attestation.

4.      The Responsible Parties agree to execute and deliver such other and further documents, instruments and/or agreements presented to them as are necessary to implement fully the terms and intent of this Attestation.

5.      The Responsible Parties have all requisite power and authority to execute this Attestation, have taken all actions required by its organizational documents and applicable law which are necessary to authorize or enable the signatories below to execute and deliver this Attestation, and represent and warrant that this Attestation is a valid and binding legal agreement by the Responsible Parties.

6.      This Attestation may be executed in multiple counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same agreement.

*[BriteLab, Inc. Factoring Agreement Attestation]*



IN WITNESS WHEREOF, the undersigned Responsible Parties do hereby execute this Attestation as of the date first above written.

**SELLER:**
**BriteLab, Inc.,**

(Signature) ment Group, Inc.
Its: Sole Shareholder

      By:    Ali Bushehri
      Its:    Shareholder & Director

By: BSC Investment Group, Inc.
Its: Sole Shareholder

      By:    Muninderpal Singh Rekhi a/k/a Bobby Rekhi
      Its:    Shareholder & Director

Its: Chairman & CEO

By: Muninderpal Singh Rekhi a/k/a Bobby Rekhi
Its: Director



IN WITNESS WHEREOF, the undersigned Responsible Parties do hereby execute this Attestation as of the date first above written.

**RESPONSIBLE INDIVIDUALS:**

*Ali Bushehri*

By:     Ali Bushehri, Individually

*Muninderpal SINGH Rekhi*

By:     Muninderpal Singh Rekhi a/k/a Bobby Rekhi, Individually



# EXHIBIT 1

**(NOTICE OF ASSIGNMENT)**

# UNANIMOUS WRITTEN CONSENT OF BOARD OF DIRECTORS

The undersigned, being all of the duly appointed directors of BriteLab, Inc., a Delaware corporation, (the "Company"), this <u>Eighth</u> day of <u>July</u>, 2024, do hereby waive any and all requirements for notice of a board meeting pursuant to the by-laws of the Company, and in accordance with the unanimous written consent of the directors pursuant to the by-laws, do hereby take the following actions and adopt the following preambles and resolutions by signing this unanimous written consent hereto:

WHEREAS, the Company is a corporation organized and existing under the laws of the State of Delaware, and the shareholders, officers, and/or Directors of the Company's Board of Directors executing this resolution below reflect all of the necessary shareholders, officers, and/or Directors of the Board of Directors of the Company required to vote and approve all transactions with respect to the operations and actions of the Company; and

WHEREAS, the Company and its shareholders, officers, and Directors of the Company's Board of Directors have reviewed and contemplated the terms and conditions of the Factoring and Security Agreement, Confession of Judgment, and other related transaction documents dated <u>07/08/2024</u> by and between ClearCoast Capital, LLC and BriteLab, Inc., a Delaware corporation (the "Factoring Documents") for purposes of entering into a factoring arrangement wherein ClearCoast Capital, LLC agrees to extend certain capital to BriteLab, Inc. for purposes of assisting in the operation of its Company's business in return for being granted a security interest in the accounts receivables and other assets of the Company, and have determined that it is advisable and in the best interest of the Company to enter into and execute the Factoring Documents; and

WHEREAS, the Company and its shareholders, officers, and/or Directors of the Company's Board of Directors have reviewed and contemplated the terms and conditions of the Factoring Documents, and understands that by virtue of the financing arrangement it is necessary that the Company grant ClearCoast Capital, LLC an Irrevocable Power of Attorney and appoint ClearCoast Capital, LLC, its special attorney in fact, or agent, with power to perform certain actions as enumerated therein on behalf of the company in order to effectuate the agreements entered into in the Factoring Documents, and have determined that it is advisable and in the best interests of the Company to enter into and execute the Factoring Documents; and

WHEREAS, the shareholders, officers, and/or Directors of the Company's Board of Directors and the Company have determined that it is advisable and in the best interests of the Company to enter into and execute the Factoring Documents, the granting of the Power of Attorney to ClearCoast Capital, LLC, and all other documents necessary to effectuate the factoring arrangement and agreements between the parties; and

NOW THEREFORE IT IS HEREBY RESOLVED, that the Factoring Agreement, Confession of Judgement, and other related documents (hereinafter "Factoring Documents") dated <u>07/08/2024</u> between BriteLab, Inc., a Delaware corporation, hereinafter referred to as ("Company") and ClearCoast Capital, LLC, its affiliates, successors and/or assigns, as their interests may appear, hereinafter referred to as ("Buyer" or "Purchaser") and all other agreements and documents connected therewith be, and the same hereby be, approved on the terms and conditions as forth therein:

*[BriteLab, Inc. – Unanimous Written Consent]*

Case: 23-51520     Doc# 69     Filed: 07/10/24     Entered: 07/10/24 11:47:13     Page 44 of 86

IT IS FURTHER RESOLVED, that an Irrevocable Power of Attorney is hereby granted to ClearCoast Capital, LLC or any person designated by ClearCoast Capital, LLC, its special attorney in fact, or agent, with power to  (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suite or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any account debtor or other obligator, without affecting any of the Obligations, and (e) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, and (f) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as obligations hereunder, and in connection with which sums the Late Charge shall be due and payable, and to (g) initiate electronic debit and/or credit entries through the ACH system to any of Seller's accounts maintained with Depository or at any other financial institution;

IT IS FURTHER RESOLVED, that any shareholder, officer, or Directors of the Board of Directors, if any, of the Company whose name(s) is/are listed below is/are hereby authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of and behalf of the Company, such agreements, amendments, addendum, schedules of assignment, account transmittals, documents, instruments, certificates, financing statements, notices of further assurances, and to perform any and all such acts and things as may be required by ClearCoast Capital, LLC, including but not limited to the authority to enter into a Factoring Agreement, in connection with said Factoring Documents or any other agreement or document connected therewith, in all respects and to implement the purposes set forth in these resolutions;

IT IS FURTHER RESOLVED, That the Company grants ClearCoast Capital, LLC the authority to endorse its name to checks, drafts, and other instruments payable to the Company and to receive cash therefore from any and all Customers of the Company and to endorse checks and drafts payable to the undersigned for deposit to the account of ClearCoast Capital, LLC or to any other account at any financial institution or bank which ClearCoast Capital, LLC may designate, and to retain such deposited funds or draw checks against same as may be determined by ClearCoast Capital, LLC;

IT IS FURTHER RESOLVED, That the undersigned agree that no revocation of this authorization shall be binding until all account(s) receivable and/or other obligations of the undersigned to ClearCoast Capital, LLC are satisfied in full, and written notice of revocation thereof has been actually received by ClearCoast Capital, LLC designated financial institution or bank, signed jointly by the undersigned and ClearCoast Capital, LLC. Such revocation shall in all events be effective only for items received subsequent to such mutually executed notification. Any written revocation not signed jointly by the undersigned and ClearCoast Capital, LLC shall have no force and effect;

IT IS FURTHER RESOLVED, That the following named persons are authorized signatories for the Company, the signature of the undersigned shall be binding upon the

Company, and the undersigned persons are authorized to execute the Factoring Documents in favor of ClearCoast Capital, LLC:

**NAME:**                  **TITLE:**                **SIGNATURE:**

Ali Bushehri                Chairman & CEO       _____

Muninderpal Singh Rekhi
a/k/a Bobby Rekhi         Director              _____

IT IS FURTHER RESOLVED, that these resolutions shall remain in full force and effect until written notice of their amendment or repeal shall be received by ClearCoast Capital, LLC and until all indebtedness and obligations arising out of said Factoring Documents and all other agreements and documents connected therewith shall have been paid and satisfied in full;

IT IS FURTHER RESOLVED, that the Company shall first receive the written approval and authorization of Buyer prior to the commencement of any proceeding under any federal, state or other law relating to bankruptcy, receivership, insolvency or other debtor relief laws initiated by or against the Company, whether voluntary or involuntary ("Insolvency Proceeding"), and should the written consent of Buyer not be received prior to the commencement of an Insolvency Proceeding, the Company shall consent to and/or join any filing made or position asserted by Buyer to dismiss such Insolvency Proceeding based on the Company's failure to receive Buyer's written consent as required by this Resolution. For the avoidance of doubt, Company desires that this be an absolute condition precedent, and the Company irrevocably waives, releases and forfeits any objection, opposition or other legal right it may have whatsoever to any filing made or position asserted by Buyer based on this Resolution. As such, the Company shall not file any pleading or other document in connection with an Insolvency Proceeding inconsistent with the provisions of this Resolution;

IT IS FURTHER RESOLVED, The undersigned, duly constitute all of the Board of Directors of the Company do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of all directors of the Board of Directors of the Company, and this unanimous written consent satisfy the by-laws and is legal authorization for the Authorized Persons above to act on behalf of the Company;

IT IS FURTHER RESOLVED, We further certify that the foregoing resolutions are within the power of the directors to pass as provided by the bylaws;

IT IS FURTHER RESOLVED, We further certify that the directors of this Company hereunder set forth have been duly elected, and as of the date hereof, hold the offices specified and that the signatures set forth beside each name are true and valid.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*
*[SIGNATURE PAGES TO FOLLOW]*

*[BriteLab, Inc. – Unanimous Written Consent]*

The above resolutions set forth in this unanimous written consent of the Board of Directors of the Company is taken and adopted as of the date first above written and shall be filed with the minutes of the Company.

**BRITELAB, INC.**
**("THE COMPANY")**

_Ali Bushehri_

By: _____ stment Group, Inc.
Its:  Sole Shareholder

  By:  Ali Bushehri
  Its:  Shareholder & Director

_Muninderpal SINGH Rekhi_

By: _____ stment Group, Inc.
Its:  Sole Shareholder

  By:  Muninderpal Singh Rekhi a/k/a Bobby Rekhi
  Its:  Shareholder & Director

**DIRECTORS**

_Ali Bushehri_

_____ hri, Individually

_Muninderpal SINGH Rekhi_

By: _____ rpal Singh Rekhi a/k/a Bobby Rekhi, Individually

_[BriteLab, Inc. – Unanimous Written Consent]_

**UNANIMOUS WRITTEN CONSENT OF BOARD OF DIRECTORS**

The undersigned, being all of the duly appointed directors of BSC Investment Group, Inc., a Delaware corporation, (the "Company"), this Eighth day of July , 2024, do hereby waive any and all requirements for notice of a board meeting pursuant to the by-laws of the Company, and in accordance with the unanimous written consent of the directors pursuant to the by-laws, do hereby take the following actions and adopt the following preambles and resolutions by signing this unanimous written consent hereto:

WHEREAS, the Company is a corporation organized and existing under the laws of the State of Delaware, and the shareholders, officers, and/or Directors of the Company's Board of Directors executing this resolution below reflect all of the necessary shareholders, officers, and/or Directors of the Board of Directors of the Company required to vote and approve all transactions with respect to the operations and actions of the Company; and

WHEREAS, the Company and its shareholders, officers, and Directors of the Company's Board of Directors have reviewed and contemplated the terms and conditions of the Corporate Continuing Guaranty (the "Corporate Guaranty"), which guaranties the obligations under the Factoring Agreement, Confession of Judgement and other related transactional documents dated 07/08/2024 by and between ClearCoast Capital, LLC and BriteLab, Inc., a Delaware corporation (the "Factoring Documents") for purposes of entering into a factoring arrangement wherein ClearCoast Capital, LLC agrees to extend certain capital to BriteLab, Inc.; and

WHEREAS, the below signed shareholders, officers, and/or Directors of the Company represent all of the Directors of the Board of Directors of the Company that are authorized to make all decisions and bind the Company for all business actions, and no other signatures or approval of any other parties are required in order to enter into and bind the Company to the Factoring Documents and resolutions contained herein; and

WHEREAS, the shareholders, officers, and/or Directors of the Company's Board of Directors and the Company have determined that it is advisable and in the best interests of the Company to enter into and execute the Corporate Continuing Guaranty, which guaranties the obligations under the Factoring Documents, , and all other documents necessary to effectuate the factoring arrangement and agreements between the parties; and

NOW THEREFORE IT IS HEREBY RESOLVED, that the Corporate Guaranty and all other agreements and documents connected therewith be, and the same hereby be, approved on the terms and conditions as forth therein:

IT IS FURTHER RESOLVED, that any shareholder, officer, or Directors of the Board of Directors, if any, of the Company whose name(s) is/are listed below is/are hereby authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of and behalf of the Company, such agreements, amendments, addendum, schedules of assignment, account transmittals, documents, instruments, certificates, financing statements, notices of further assurances, and to perform any and all such acts and things as may be required by ClearCoast Capital, LLC, including but not limited to the authority to enter into a Corporate Guaranty, in connection with said Factoring Documents or any other agreement or document connected therewith, in all respects and to implement the purposes set forth in these resolutions;

- 1 -

*[BSC Investment Group, Inc. – Unanimous Written Consent]*

IT IS FURTHER RESOLVED, That the following named persons are authorized signatories for the Company, the signature of the undersigned shall be binding upon the Company, and the undersigned persons are authorized to execute the Factoring Documents in favor of ClearCoast Capital, LLC:

| NAME: | TITLE: | SIGNATURE: |
|---|---|---|
| Ali Bushehri | Shareholder & Director | _____ |
| Muninderpal Singh Rekhi a/k/a Bobby Rekhi | Shareholder & Director | _____ |

IT IS FURTHER RESOLVED, that these resolutions shall remain in full force and effect until written notice of their amendment or repeal shall be received by ClearCoast Capital, LLC and until all indebtedness and obligations arising out of said Factoring Documents and all other agreements and documents connected therewith shall have been paid and satisfied in full;

IT IS FURTHER RESOLVED, The undersigned, duly constitute all of the Board of Directors of the Company do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of all directors of the Board of Directors of the Company, and this unanimous written consent satisfy the by-laws and is legal authorization for the Authorized Persons above to act on behalf of the Company;

IT IS FURTHER RESOLVED, We further certify that the foregoing resolutions are within the power of the directors to pass as provided by the bylaws;

IT IS FURTHER RESOLVED, We further certify that the directors of this Company hereunder set forth have been duly elected, and as of the date hereof, hold the offices specified and that the signatures set forth beside each name are true and valid.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*
*[SIGNATURE PAGES TO FOLLOW]*

*[BSC Investment Group, Inc. – Unanimous Written Consent]*

The above resolutions set forth in this unanimous written consent of the Board of Directors of the Company is taken and adopted as of the date first above written and shall be filed with the minutes of the Company.


**BSC INVESTMENT GROUP, INC.**
**("THE COMPANY")**

_Ali Bushehri_

By: Ali Bushehri
Its:      Shareholder & Director

_Muninderpal SINGH Rekhi_

by: Muninderpal Singh Rekhi a/k/a Bobby Rekhi
Its:      Shareholder & Director


**DIRECTOR**

_Ali Bushehri_

Ali Bushehri, Individually

_Muninderpal SINGH Rekhi_

by: Muninderpal Singh Rekhi a/k/a Bobby Rekhi, Individually

_[BSC Investment Group, Inc. – Unanimous Written Consent]_

# CORPORATE CONTINUING GUARANTY

In consideration of financial accommodations provided or to be provided, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, to BriteLab, Inc. (herein called "Debtor") by ClearCoast Capital, LLC (herein called the "Creditor"), and in consideration of the Creditor's agreeing to deal and continue to deal with the Debtor, the undersigned, BSC Investment Group, Inc. ("Guarantor"), whose address is Guarantor Address, hereby agrees as follows:

1. Guarantor, jointly and severally, and in solido, hereby guarantees Creditor, its successors, endorsees and assigns, (collectively called the "Creditor") that BriteLab, Inc. (the "Debtor", whose address is 6341 San Ignacio Ave., San Jose, CA 95119, shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to the Creditor, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted or with otherwise acquired by the Creditor (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness").

2. This Guaranty is an absolute guaranty of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, or agreements related thereto (collectively called "Agreements") or any security or collateral therefore (collectively called "Security") or the pursuit by the Creditor of any rights or remedies which it has or may hereafter have.

3. If the Debtor fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by the Creditor by reason of the Debtor's default or the attorneys' fees and expenses which may be suffered by the Creditor by reason for the Debtor's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement law and without required the Creditor to (i) proceed against the Debtor by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy the Creditor may have against the Debtor, any co-Guarantor (whether hereunder or under a separate instrument) or any other party.

4. Guarantor agrees that Creditor may offset, deduct, collect, retain and transfer the collateral, including but not limited to, the accounts and proceeds thereof, of the Guarantor without notice to Guarantor. Furthermore, Guarantor acknowledges that it has granted Creditor the right to notify its account debtors to make payment directly to Creditor pursuant to 9-406 and 9-607 of the Uniform Commercial Code.

5. Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety; the records of the Creditor shall be received as conclusive evidence of the amount of the indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of the Creditor, with or without joinder of the Debtor of any of the other Guarantors, at the option of the Creditor, with or without joinder of the Debtor of any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Debtor may have against the Creditor, other than full payment of indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Please Initial Here *A B*

SignNow e-signature ID: f70c3645ba...

SignNow e-signature ID: 841f59f767093920b89907 UTC
07/08/2024 23:10:08 UTC

1

6. **GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE DEBTOR'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT THE CREDITOR HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE DEBTOR THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF THE CREDITOR AGAINST THE DEBTOR OR ANY SECURITY WHICH THE CREDITOR NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.**

7. No termination hereof shall be effective until Guarantor delivers to the Creditor a written notice signed by them electing not to guaranty any new extension of credit that may be granted by the Creditor to the Debtor after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all indebtedness existing at the time such notice is received.

8. Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by the Creditor to the Debtor from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to the Creditor by the Debtor, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury.

9. The Creditor may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all for the indebtedness of the Debtor or and Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security; (e) bid and purchase at any sale of any of the Agreements of Security; and (f) exercise any and all rights and remedies available to the Creditor by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Debtor.

10. Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and the Creditor shall not be estopped from exercising any rights hereunder, notwithstanding (i) the Creditor waiver of or failure to enforce any terms, covenants or conditions continued in any of the Agreements; (ii) any release or failure on the party of the Creditor to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) the Creditor failure to take new, additional or substitute security or collateral for the Indebtedness.

11. This Guaranty shall be governed by the laws of the state of South Carolina.

12. Each Guarantor agrees that the Creditor may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which the Creditor's office administering the Indebtedness is located.

2

Please Initial Here *A B*

SignNow e-signature ID: 7557782b33...
SignNow e-signature ID: 2187a1c407a93320 0f5a407 UTC
07/08/2024 23:10:08 UTC

13. Guarantor represents, covenants, and warrants to Creditor, that it shall not form, create, or cause to form, create, operate, or use any "Alter Ego Entity" (as defined herein) with the name BriteLab, Inc., or any similar name or other entity or business, joint venture or otherwise, with respect to BriteLab, Inc. or BSC Investment Group, Inc.'s business. Guarantor expressly acknowledges, covenants, and represents that it understands that an Alter Ego Entity is formed or occurs in instances whereby: (i) an individual or entity completely disregards the distinctiveness of the entity and ignores the corporate form of an entity such as BriteLab, Inc.; (ii) an entity is formed to direct or take business away from the actual entity operating (here BriteLab, Inc.) the respective business to avoid creditors or sidestep existing obligations; (iii) makes or directs transfers of accounts, customers, equipment, assets, and property from one distinctive company (such as BriteLab, Inc.) to another purportedly formed entity for purposes of evading creditors or for other improper purposes; and (iv) other similar actions. In connection with the covenants herein, Guarantor (as the primary owner, authorized person, and beneficiary of BSC Investment Group, Inc. and BriteLab, Inc.) covenants that it shall not cause, directly or indirectly, for any BriteLab, Inc. business, customers, property, assets, work, projects, invoices, payment rights, or the like to be directed through any Alter Ego Entity, or any entity other than BriteLab, Inc. without the written and signed consent of the Creditor.

The failure of Creditor to comply with this <u>Section 13</u> of the Guaranty shall be considered an immediate breach of this Guaranty, the Factoring Agreement, and all related transaction documents. Upon the occurrence of such breach under this Section Creditor shall be authorized to take immediate action to liquate, collect, and enforce under this Guaranty, the Factoring Agreement, and any other rated transaction documents.

14. All rights and remedies of the Creditor are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. If any term or provision hereof is declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

BSC Investment Group, Inc.
("Guarantor")

*Ali Bushehri*

Verified by signNow
07/08/2024 23:10:08 UTC
a7ac0d7200324b2586ea

Ali Bushehri
Its: Shareholder & Director

*Munindepal SINGH Rekhi*

Verified by signNow
07/09/2024 03:06:07 UTC
5f3956a2b92b456b9f4f

Munindepal Singh Rekhi a/k/a Bobby Rekhi
Its: Shareholder & Director

Please Initial Here  *A B*

3

SignNow e-signature ID: 11b9b1c484...
SignNow e-signature ID: 11b9b1c48407999900b99007 UTC
07/08/2024 23:10:08 UTC

## CONTINUING UNCONDITIONAL GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually, a "*Guarantor*" and collectively, the "*Guarantors*") jointly and severally and in solido, hereby guaranty ClearCoast Capital, LLC, a Delaware Limited Liability Company, its affiliates, successors and/or assigns, as their interests may appear, (collectively, the "*Company*") that BriteLab, Inc. (the "*Client*"), whose address is 6341 San Ignacio Ave., San Jose, CA 95119, shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to the Company, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted  for or afterwards incurred (all of which liabilities, obligations and indebtedness are collectively called the "*Indebtedness*").

This Guaranty is an absolute guaranty of payment and not of collectability.  The liability of each Guarantor hereunder is not conditional or contingent upon genuineness, validity, sufficiency or enforceability of the indebtedness or any instruments, contracts, agreements, addendum, chattel paper or other documents related thereto (collectively, the "*Agreements*") or any security or collateral therefore (collectively, the called "*Security*") or the pursuit by the Company of any rights or remedies which it has or may hereafter have. If the Client fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by the Company by reason of the Client's default or the attorneys' fees and expenses which may be suffered by the Company by reason for the Client's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Security or Collateral, all without relief from valuation and appraisement law and without required the Company to (i) proceed against the Client by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy the Company may have against the Client, any co-Guarantor (whether hereunder or under a separate instrument) or any other party.

Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of the Company shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of the Company, with or without joinder of the Client or any of the other Guarantors, as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Client may have against the Company, other than full payment of

- 1 -
*[Continuing Guaranty of Ali Bushehri]*

Guarantor's Initials    SignNow e-signature ID: 5bfa82103a...
07/08/2024 23:10:08 UTC

indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

**EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE CLIENT'S CONDITION OR OF ANY OTHER FACT, WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT THE COMPANY HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF THE COMPANY AGAINST THE CLIENT OR ANY SECURITY WHICH THE COMPANY NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.**

Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by the Company to the Client from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of Indebtedness signed, accepted, endorsed or assigned to the Company by the Client, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury.

The Company may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Client, any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, Security or Collateral; (d) bid and purchase at any sale of any of the Agreements of Security; and (e) exercise any and all rights and remedies available to the Company by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Client. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and the Company shall not be estopped from exercising any rights hereunder, even if (i) the Company waives or fails to enforce any terms, covenants or conditions contained in any of the Agreements; (ii) release or failure on the part of the Company to perfect any security interest in or foreclose, proceed against, or

*[Continuing Guaranty of Ali Bushehri]*

Guarantor's Initials    SignNow e-signature ID: a2ed1ac703...
07/08/2024 23:10:08 UTC

exhaust, any Security or Collateral; or (iii) the Company fails to take new, additional or substitute security or collateral for the Indebtedness.

As security for the payment and performance of all Guarantor's obligations under this Guaranty, Guarantor hereby transfers and grants to the Company a first priority security interest in all of Guarantor's presently-owned and hereafter-acquired personal and fixture property, wherever located, including, without limitation, all Accounts, Goods, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Deposit Accounts, Commercial Tort Claims, Letters-of-Credit Rights, General Intangibles including Payment Intangibles, Patents, Software Trademarks, Trade Names, Customer Lists, Supporting Obligations, all proceeds and products of the foregoing, including without limitation, insurance proceeds, lock box contents and proceeds from the accounts of the Client's account debtors (the "*Collateral*"). In the event of any breach by Guarantor under this Guaranty or any other obligation of Guarantor to the Company, the Company shall have all rights with respect to the aforesaid Collateral as a secured party under the applicable UCC laws as hereinafter provided.

Each Guarantor agrees that the Company may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court of competent jurisdiction, including the courts located in Charleston, South Carolina. Each Guarantor shall be liable for all attorney's fees and all other costs and expenses incurred by Company related to this Guaranty and the enforcement of this Guaranty. All rights and remedies of the Company are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. If any term or provision hereof is declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

The parties to this Guaranty agree and acknowledge that the Company may assign, transfer, convey, hypothecate or pledge any or all of its rights and/or obligations under this Guaranty, the Agreements and other related documents to any person, including – but not limited to – any person or entity affiliated with the Company or another creditor, without the prior written consent of and without giving notice to the Guarantor. The Guarantor further acknowledges and agrees that any assignee, transferee and/or creditor will acquire and assume all interest and rights to payments, enforcement of obligations and claims, and will act in the stead of the Company in every regard whatsoever with respect to all rights and claims under this this Guaranty, the Agreements and other related documents. The Guarantor expressly agrees to this Section and acknowledges the validity of any future assignment, transfer, hypothecation or pledge without the prior written consent of and without giving notice to the Guarantor, and agrees that any assignment, transfer, hypothecation or pledge by the Company will not

Guarantor's Initials  SignNow E-Signature ID: f577b1d310...
07/08/2024 23:10:08 UTC

be asserted as the basis for any defense or claim against the Company, transferee, assignee and/or creditor.

**WAIVER OF TRIAL BY JURY. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL AND, TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY A TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

*[THIS SPACE LEFT BLANK]*
*[SIGNATURE PAGE TO FOLLOW]*

- 4 -
*[Continuing Guaranty of Ali Bushehri]*

Guarantor's Initials    Signed by: 1f46fbf69    DocuSign ID: c0e2859a7...    07/08/2024 23:10:08 UTC

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty on 07/08/2024 .

_Ali Bushehri_

S  Verified by signNow
07/08/2024 23:10:08 UTC
edcdfcf4ac604081850e

Ali Bushehri
Personally

Social Security Number 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

*[Signature Page – Continuing Guaranty of Ali Bushehri]*

Guarantor's Initials  _A B_  Signed with SignNow Signature ID: cfa89e5dd...
07/08/2024 23:10:08 UTC

## CONTINUING UNCONDITIONAL GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually, a "*Guarantor*" and collectively, the "*Guarantors*") jointly and severally and in solido, hereby guaranty ClearCoast Capital, LLC, a Delaware Limited Liability Company, its affiliates, successors and/or assigns, as their interests may appear, (collectively, the "*Company*") that BriteLab, Inc. (the "*Client*"), whose address is 6341 San Ignacio Ave., San Jose, CA 95119, shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to the Company, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted  for or afterwards incurred (all of which liabilities, obligations and indebtedness are collectively called the "*Indebtedness*").

This Guaranty is an absolute guaranty of payment and not of collectability.  The liability of each Guarantor hereunder is not conditional or contingent upon genuineness, validity, sufficiency or enforceability of the indebtedness or any instruments, contracts, agreements, addendum, chattel paper or other documents related thereto (collectively, the "*Agreements*") or any security or collateral therefore (collectively, the called "*Security*") or the pursuit by the Company of any rights or remedies which it has or may hereafter have. If the Client fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by the Company by reason of the Client's default or the attorneys' fees and expenses which may be suffered by the Company by reason for the Client's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Security or Collateral, all without relief from valuation and appraisement law and without required the Company to (i) proceed against the Client by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy the Company may have against the Client, any co-Guarantor (whether hereunder or under a separate instrument) or any other party.

Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of the Company shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of the Company, with or without joinder of the Client or any of the other Guarantors, as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Client may have against the Company, other than full payment of

*[Continuing Guaranty of Muninderpal Singh Rekhi a/k/a Bobby Rekhi]*

SignNow e-signature ID: 0ee5afdf49...
07/01/2024 04:06 UTC

indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

**EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE CLIENT'S CONDITION OR OF ANY OTHER FACT, WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT THE COMPANY HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF THE COMPANY AGAINST THE CLIENT OR ANY SECURITY WHICH THE COMPANY NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.**

Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by the Company to the Client from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of Indebtedness signed, accepted, endorsed or assigned to the Company by the Client, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury.

The Company may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Client, any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, Security or Collateral; (d) bid and purchase at any sale of any of the Agreements of Security; and (e) exercise any and all rights and remedies available to the Company by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Client. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and the Company shall not be estopped from exercising any rights hereunder, even if (i) the Company waives or fails to enforce any terms, covenants or conditions contained in any of the Agreements; (ii) release or failure on the part of the Company to perfect any security interest in or foreclose, proceed against, or

*[Continuing Guaranty of Muninderpal Singh Rekhi a/k/a Bobby Rekhi]*

Guarantor's Initials

SignNow e-signature ID: 9ef679332e
07/03/2024 03:05 UTC

exhaust, any Security or Collateral; or (iii) the Company fails to take new, additional or substitute security or collateral for the Indebtedness.

As security for the payment and performance of all Guarantor's obligations under this Guaranty, Guarantor hereby transfers and grants to the Company a first priority security interest in all of Guarantor's presently-owned and hereafter-acquired personal and fixture property, wherever located, including, without limitation, all Accounts, Goods, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Deposit Accounts, Commercial Tort Claims, Letters-of-Credit Rights, General Intangibles including Payment Intangibles, Patents, Software Trademarks, Trade Names, Customer Lists, Supporting Obligations, all proceeds and products of the foregoing, including without limitation, insurance proceeds, lock box contents and proceeds from the accounts of the Client's account debtors (the "*Collateral*"). In the event of any breach by Guarantor under this Guaranty or any other obligation of Guarantor to the Company, the Company shall have all rights with respect to the aforesaid Collateral as a secured party under the applicable UCC laws as hereinafter provided.

Each Guarantor agrees that the Company may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court of competent jurisdiction, including the courts located in Charleston, South Carolina. Each Guarantor shall be liable for all attorney's fees and all other costs and expenses incurred by Company related to this Guaranty and the enforcement of this Guaranty. All rights and remedies of the Company are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. If any term or provision hereof is declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

The parties to this Guaranty agree and acknowledge that the Company may assign, transfer, convey, hypothecate or pledge any or all of its rights and/or obligations under this Guaranty, the Agreements and other related documents to any person, including – but not limited to – any person or entity affiliated with the Company or another creditor, without the prior written consent of and without giving notice to the Guarantor. The Guarantor further acknowledges and agrees that any assignee, transferee and/or creditor will acquire and assume all interest and rights to payments, enforcement of obligations and claims, and will act in the stead of the Company in every regard whatsoever with respect to all rights and claims under this this Guaranty, the Agreements and other related documents. The Guarantor expressly agrees to this Section and acknowledges the validity of any future assignment, transfer, hypothecation or pledge without the prior written consent of and without giving notice to the Guarantor, and agrees that any assignment, transfer, hypothecation or pledge by the Company will not

SignNow e-signature ID: 6720a8e037...
07/09/2024 03:06:09 UTC

be asserted as the basis for any defense or claim against the Company, transferee, assignee and/or creditor.

**WAIVER OF TRIAL BY JURY.** IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL AND, TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY A TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

*[THIS SPACE LEFT BLANK]*
*[SIGNATURE PAGE TO FOLLOW]*

- 4 -
*[Continuing Guaranty of Muninderpal Singh Rekhi a/k/a Bobby Rekhi]*

SignNow e-signature ID: b73b6b752d
07/04/2024 03:08:09 UTC

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty on
07/08/2024                      .

*Muninderpal SINGH Rekhi*

Verified by signNow
07/09/2024 03:06:07 UTC
0d56c84de4ac4cd18f61

_____

Muninderpal Singh Rekhi a/k/a Bobby Rekhi
Personally

Social Security Number 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

*[Signature Page – Continuing Guaranty of Muninderpal Singh Rekhi a/k/a Bobby Rekhi]*

Guarantor's Initials    SignNow e-signature ID: eef8f7db36
07/09/2024 03:06:07 UTC



## AUTHORIZATION TO RELEASE INFORMATION
## BLANKET AUTHORIZATION

Business Name:        BriteLab, Inc.

Business Address:     6341 San Ignacio Ave., San Jose, CA 95119

Business Telephone:   650-961-0671

     I, Ali Bushehri, authorize all trade references, sources, banking and financial institutions, credit reporting agencies, and any other resource deemed necessary to release credit information to ClearCoast Capital, LLC or its designee(s). A photocopy, facsimile copy, scanned copy, or any other electronic form of this document shall remain as valid as the original.

     I, Ali Bushehri, authorize all insurance agents to list ClearCoast Capital, LLC or its designee(s) as additional insured on our General Liability Policy and loss payee on our Commercial Auto Policy.

     Applicant acknowledges that ClearCoast Capital, LLC, and /or its affiliates, successors and assigns, may conduct a credit investigation on applicant at any time throughout the contract term.

Thank you for your assistance.

Client Name:   BriteLab, Inc.

Signature:   _Ali Bushehri_

Verified by signNow
07/08/2024 23:10:08 UTC
814ab389c83449288a9ba

Printed Name:

Date:   07/08/2024



<div style="border:1px solid black; text-align:center;">

# FUNDING INSTRUCTIONS

</div>

## BriteLab, Inc.

Welcome to ClearCoast! We look forward to this new partnership and working together to ensure your current and future growth. Below are instructions regarding our funding processes:

1). If you will not be coming into one of our offices for closing, please scan and email a copy of the signed, notarized documents to your Closing Coordinator. In addition, please overnight the original documents to our corporate office at 840 Lowcountry Blvd., Mount Pleasant, SC 29464.

The original documents must be sent to our corporate office no later than the next business day following execution.

2). For existing invoices, assemble copies of all invoices to be factored, along with all support information (signed delivery tickets, trip tickets, purchase orders, employee timesheets, etc.)

    Exclude invoices:

        A) Subject to any dispute, offset or those over 45 days old.
        B) For customers with whom you buy and sell products or services.
        C) Not approved for funding by ClearCoast Capital.

3). We ask that you contact all customers for which we will be factoring invoices prior to funding. Please inform them of our relationship and let them know we will be contacting them shortly. This will promote a smooth transition for your customer and help us to serve you better.

4). You must prominently place our remittance address onto your original invoices:

<div style="text-align:center;">

**ClearCoast Capital, LLC**
**P.O. Box 2323**
**Mount Pleasant, SC 29465**

</div>

5). Funding is usually available within 24 hours of receipt of your invoice(s) and required supporting documentation.

6). Refunds from your reserve account on paid invoices will be returned to you every Friday, provided that you have no existing disputed invoices or invoices outstanding beyond 60 days from original invoice date.

7). Your account information is available through our online software, FactorFox. Your Account Manager will provide you with access to this software. Your login information is as follows:

    Username: ali.bushehri@britelab.com
    Password: Britelab24!



## BriteLab, Inc.

Please indicate below how funds are to be delivered to your company (check one):

_____ Hold check at ClearCoast office for pick-up

_____ Send check via regular mail

_____ Wire transfer funds to my account ($25 charge). Attach voided check.

Wiring Instructions – Please complete

**EXACT** Name on Bank Account: BriteLab, Inc. Chapter 11 DIP-Operating

Address on Bank Account: 6341 San Ignacio Ave., San Jose, CA 95119

Bank Name: East West Bank

Bank Telephone #: 626-768-6242

Bank Address, City, State, Zip: 135 N Los Robles, Suiye 600, Pasadena,

Bank Account #: 5500019292

Routing # (wire): 322070381

Routing # (ACH): 322070381

Signature: _Ali Bushehri_____

Verified by signNow
07/08/2024 23:10:08 UTC
e6a7e2b841ee4ac2bf65

Date: 07/08/2024

*A fee of up to 5% will be charged if the information provided is not correct and results in a returned wire.*



## ACH AUTHORIZATION FORM

Dated: 07/08/2024

**Customer Name:** BriteLab, Inc.

**Customer Address:** 6341 San Ignacio Ave., San Jose, CA 95119

The Customer identified above hereby authorizes ClearCoast Capital, LLC (the "Company") to initiate entries into my deposit, checking or savings accounts with the financial institution identified below (the "Financial Account").

| Financial Account Information | |
| --- | --- |
| Name of Financial Institution | East West Bank |
| Address of Financial Institution | 15 N. Los Robles Ave.,Suite 600, Pasadena, CA 91101 |
| Checking or Savings | Checking |
| Exact Name on Account | BriteLab, Inc. Chapter 11 DIP-Operating |
| Routing/ABA Number: | 322070381 |
| Account Number: | 5500019292 |

The Customer acknowledges that the origination of ACH transactions to the Financial Account must comply with the provisions of U.S. law. The Customer agrees to be bound by the ACH Rules as set forth by NACHA. The Customer further agrees that these Financial Accounts remain subject to their individual terms and conditions, rules and regulations imposed by the respected financial institution.

Signature: _Ali Bushehri_

Verified by signNow
07/08/2024 23:10:08 UTC
4e8025f3e2dd44619ec5

By: Ali Busnenri

Title: Chairman & CEO

***Please attach a voided check***



# CLIENT CONTACT INFORMATION

## (Please include all owners and staff that we will be working with)

Name: Ali Bushehri

Office Phone #: 510-409-4982

Cell Phone #: 510-409-4982

Home Phone #: 510-409-4982

Email Address: ali.bushehri@britelab.com

Position: CEO


Name: Muninderpal Singh Rekhi a/k/a Bobby Rekhi

Office Phone #: 4083152388

Cell Phone #: 4083152388

Home Phone #: 4083152388

Email Address: bobby_rekhi@yahoo.com

Position: Director


Name: _____

Office Phone #: _____

Cell Phone #: _____

Home Phone #: _____

Email Address: _____

Position: _____


Name: _____

Office Phone #: _____

Cell Phone #: _____

Home Phone #: _____

Email Address: _____

Position: _____

EXHIBIT "2"

RON BENDER (SBN 143364)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER,
YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: RB@LNBYG.COM; JPF@LNBYG.COM

Counsel for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>BRITELAB, INC.,<br>a Delaware corporation<br><br>              Debtor and Debtor in Possession. | Case No.: 23-51520<br><br>Chapter 11 Case (Subchapter V)<br><br>**INTERIM ORDER AUTHORIZING DEBTOR TO SELL ACCOUNTS RECEIVABLE PURSUANT TO 11 U.S.C. §§ 363(b) AND (f) AND GRANTING CLEAR COAST CAPITAL, LLC A SUPER PRIORITY SECURITY INTEREST PURSUANT TO 11 U.S.C. §§ 364(c) AND (d)**<br><br>**Emergency Interim Hearing:**<br>Date:    To be set by court<br>Time:    To be set by court<br>Place:    United States Courthouse<br>           Courtroom 9<br>           280 South First Street<br>           San Jose, CA 95113-3099[1] |

---

[1] The hearing on this matter will take place remotely by video or telephone. No in-person appearance in the courtroom is available. The Bankruptcy Court's website provides information regarding how to arrange an appearance at a video or telephonic hearing. If you have questions about how to participate in a video or telephonic hearing, you may contact the courtroom deputy, Anna Lee, at (408) 278-7517 or email her at: anna_e_lee@canb.uscourts.gov. *See also* www.canb.uscourts.gov/calendars.

This matter is before the Court on the Debtor's motion of the debtor-in-possession in the above-captioned case (the "**Debtor**") requesting entry of an interim order authorizing the Debtor to enter into a post-petition financing arrangement with Clear Coast Capital, LLC (the "**DIP Lender**") by which the Debtor will sell certain accounts receivable pursuant to 11 U.S.C. §§ 363(b) and (f) and granting super priority, first position security interests pursuant to 11 U.S.C. §§ 364(c) and (d) of the Bankruptcy Code (the "**Bankruptcy Code**") (the "**Interim Financing Motion**"). Based upon this Court's review of the Interim Financing Motion, the record, and all matters brought to the Court's attention at the First Interim Hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable to the financing sought by Debtor from DIP Lender and Debtor's request to use cash collateral (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A. On December 29, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in this Court (the "**Chapter 11 Case**" or "**Case**"). The Debtor is continuing to operate its businesses and manage its property as debtors-in-possession. No trustee or examiner has been appointed herein.

B. The Debtor has approximately 48 employees, operates its business from a leased location consisting of approximately 52,600 rentable square feet located at 6341-6371 San Ignacio Avenue in San Jose, California, and is in the business of highly-complex and precision-system engineering and assembly for robotics, automation, and electro-mechanical contract engineering and contract manufacturing industries.

C. An immediate and ongoing need exists for Debtor to obtain financing and use the cash proceeds of the Collateral (as defined below) (the "**Cash Collateral**") to continue the operation of its

business as debtor-in-possession under Chapter 11 of the Bankruptcy Code, to minimize the disruption of Debtor's business and to allow Debtor to pursue reorganization under Chapter 11. Despite diligent efforts, Debtor has been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and Debtor is unable to obtain financing in the form of credit secured by liens that are junior to existing liens on property of the estates pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

D.      Debtor has requested that DIP Lender establish a new secured factoring facility in favor of Debtor (the "**DIP Facility**") pursuant to which Debtor may obtain advances from time to time (the "**DIP Advances**"), up to $3,000,000 in advances outstanding, upon the terms and conditions set forth herein and in a Factoring and Security Agreement dated July __, 2024, which is attached to the Interim Financing Motion (the "**Factoring Agreement**").

E.      DIP Lender is willing to make DIP Advances, upon the terms and conditions set forth herein and the Factoring Agreement on an interim basis until such time that the parties can execute final factoring agreements and this Court can enter a final order on the DIP financing. DIP Lender's willingness to make DIP Advances and other extensions of credit on an interim basis (collectively, the "**DIP Credit Extensions**") is conditioned upon the DIP Lender receiving a first priority security interest in and lien upon all of Debtor's pre-petition and post-petition assets (both real and personal), including, without limitation, Debtor's accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, causes of action, estate causes of action, causes of action as against the Debtor's account-debtors under 11 U.S.C. §§ 541, 542, 543, 544, 546, 547, 548, 549, 550, contract rights, investment property, leasehold interests, supporting obligations, cash, and books and records relating to any assets of Debtor and all cash and non-cash

proceeds (including insurance proceeds) of the foregoing, whether now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, and the proceeds thereof, being collectively hereinafter referred to as the "**Collateral**"), and that such liens have the first priority hereinafter set forth.

F.    Debtor has certified that a copy of the Interim Financing Motion (together with copies of the Factoring Agreement) and notice of the Hearing have been served by electronic mail, telecopy transmission, hand delivery, overnight courier and/or first-class United States mail upon the U.S. Trustee, any subordinated Creditor, and any known lien creditors of Debtor, and all parties requesting notice. The Court finds that notice of the Interim Financing Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c).

L.    Good cause has been shown for the entry of this Order and authorization for Debtor to obtain DIP Credit Extensions pursuant to the Factoring Agreement and to use Cash Collateral as hereinafter provided. Debtor's need for financing of the type afforded by the Factoring Agreement remains immediate and critical. Entry of this Order will minimize disruption of Debtor's business and operations, will preserve the assets of Debtor's estates and is in the best interests of Debtor, its creditors and its estates. The terms of the proposed financing and use of Cash Collateral are fair and reasonable, reflect Debtor's exercise of business judgment and are supported by reasonably equivalent value and fair consideration.

M.    Based upon the statements and any evidence presented at the Hearing on the Interim Financing Motion, and the record in this Case as a whole, the terms of the Factoring Agreement and this Order have been negotiated in good faith and at arm's length between Debtor, on the one hand, and DIP Lender, on the other. Therefore, all DIP Credit Extensions to Debtor pursuant to the Factoring Agreement

shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

N. This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Interim Financing Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1. The Interim Financing Motion is GRANTED on an interim basis.

2. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Interim Financing Motion.

3. The Debtor is authorized to take DIP Credit Extensions in accordance with the Factoring Agreement from time to time up to an aggregate advance amount outstanding at any time not to exceed $3,000,000.00, and to incur any and all liabilities and obligations thereunder and to pay all charges, fees, expenses and other accruals and to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof.

4. All DIP Credit Extensions, together with all charges, fees and other accruals (including, without limitation, reasonable legal fees) at any time or times payable by Debtor to DIP Lender in connection therewith or otherwise related to the Factoring Agreement (all such DIP Credit Extensions, interest fees and other charges, including any "Obligations" as such term is defined in the DIP Credit Agreement, are collectively called the "**DIP Obligations**") shall be, and hereby are, secured by security interests and liens in favor of DIP Lender with respect to all of the Collateral (collectively, the "**DIP Liens**") The DIP Liens shall have super priority pursuant to Section 364(d) and Section 510(a) of the Bankruptcy Code, and the DIP Liens shall prime and shall be senior in priority to all pre-petition liens and security interests with respect to any of the Collateral.

5.       The DIP Liens shall be deemed valid, binding, enforceable and perfected upon entry of this Order.  DIP Lender shall not be required to file any UCC-1 financing statements, fixture filings, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the DIP Liens.  DIP Lender may, in its discretion, file a certified copy of this Order, UCC-1 financing statements, fixture filings, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document in any filing office in any jurisdiction in which Debtor is organized or has or maintains any Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording.

6.       DIP Lender is authorized to affix and sign Debtor's or its corporate representative's signature to notifications under Section 9-406 of the UCC (a "***Notice of Assignment***") and send Notices of Assignment to all the Account Debtors of Debtor directing them to remit payment on Accounts directly to Purchaser.  Debtor is authorized to communicate directly with Account Debtors to verify the amount, validity or any matter relating to any Account and may charge back aged Accounts and substitute with other Accounts, proceeds from other Collateral, apply payments from other Accounts, amounts in escrow, or the Reserve Account.  Once a Notice of Assignment is sent to an Account Debtor, the Debtor shall indicate on the invoices reflecting the Accounts that DIP Lender is the assignee of the account and DIP Lender's address and banking information so remittances can be made directly to DIP Lender.  The DIP Lender shall not be obligated to release any Notice of Assignments or other security interests granted to DIP Lender unless Debtor has satisfied all of its obligations to DIP under the Factoring Agreement or is order by the Court.

7.       Unless the non-payment of a Purchased Account is due to the insolvency of the Account Debtor, DIP Lender shall have the right to require the Debtor to repurchase a Purchased Account if it

remains unpaid after payment due date set forth on the invoice, and if not repurchased, DIP Lender shall have the right to charge back the Purchased Account after ninety (90) days after the invoice date.

8.     The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the Factoring Agreement, without offset or counterclaim.

9.     All proceeds realized from any Collateral shall be remitted directly to the DIP Lender, through a lock-box or other similar facility under the sole control of the DIP Lender DIP Obligations. The Debtor is expressly prohibited from receiving and retaining any payments made on accounts that have been pledged as Collateral under the Factoring Agreement to secure the DIP Obligations. Such proceeds shall be remitted to the DIP Lender and applied to the DIP Obligations.

10.     Upon or after the occurrence of a "**Default**" under (and as defined in) the Factoring Agreement, including, without limitation, an Event of Default resulting from Debtor's failure to cure within five (5) business days after notice of any of the following events or conditions: (a) 25% or more of the face value of the purchased accounts have aged ninety (90) days without payment; (b) Debtor fails to pay any charges or fees; (c) any of the representations and warranties are untrue; (e) Debtor fails to adhere to and comply with any other of its obligations in the Factoring Agreement; or (d) DIP Lender reasonably deems itself insecure in its expectation that Debtor will fully perform all of its obligations under the Factoring Agreement. Then, in any such event, DIP Lender shall be fully authorized, in its sole discretion, to terminate further DIP Credit Extensions under the Factoring Agreement, to demand payment of all DIP Obligations, and, upon ten (10) business days' prior written notice to counsel for Debtor, the Subchapter V Trustee, the U.S. Trustee, and all parties requesting notice in the Chapter 11 Case to enforce the DIP Liens with respect to the Collateral and to take all other action and exercise all other remedies under applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations, to proceed against or realize upon all or any portion of the Collateral as if the Chapter 11 Case

Case: 23-51520    Doc# 69    Filed: 07/10/24    Entered: 07/10/24 11:47:13    Page 76 of 86

or any superseding Chapter 7 case was not pending and otherwise to enforce the Factoring Agreement and this Order. Said right to exercise remedies is without prejudice to the right of the Debtor or Committee to file a motion seeking to stay or prohibit the exercise of such remedies for cause shown or to contest that an Event of Default has occurred. The rights, remedies, powers and privileges conferred upon DIP Lender pursuant to this Order shall be in addition to, and cumulative with, those contained in the Factoring Agreement.

11. All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of the DIP Financing Documents, or any amendments thereto, the preservation, perfection, protection and enforcement of DIP Lender's rights hereunder or under the Factoring Agreement, or in the collection of the DIP Obligations, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations and shall be paid by Debtor in accordance with the terms of the DIP Financing Documents. Fees and expenses incurred by professionals retained by DIP Lender in order to enforce the DIP Liens, realize upon or liquidate the Collateral or otherwise collect the DIP Obligations upon the occurrence of an Event of Default by the Debtor under this Order or the DIP Financing Documents are subject to this Court's approval pursuant to separate Order of the Court.

12. This Order shall constitute a valid, binding obligation of the Debtor enforceable against the Debtor in accordance with its terms.

13. The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this Order and the Factoring Agreement, thereby permitting DIP Lender to receive collections of Collateral for application to

8

the DIP Obligations as provided herein, to file or record any UCC-1 financing statements, fixture filings, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens and to enforce the DIP Liens upon Event of Default subject to the prior notice provisions of this Order.

14.     Neither DIP Lender nor the Debtor shall be required to take any action or obtain any additional orders to enjoy the benefits and/or protections of this Order. Nothing herein is intended, however, to waive any rights of DIP Lender to request any relief it may believe is appropriate, including to seek additional adequate protection of its interests in its collateral, relief from the automatic stay, conversion of the cases, to propose a plan of reorganization or liquidation, to object to a plan of reorganization, or any other relief or remedies that may be available to DIP Lender under bankruptcy or non-bankruptcy law.

15.     The provisions of this Order shall be binding upon DIP Lender and the Debtor and their respective successors and assigns (including any Trustee hereinafter appointed for the estate of the Debtor) and inure to the benefit of DIP Lender and the Debtor and their respective successors and assigns.

16.     By consenting to this Order, making DIP Credit Extensions or administering the financing relationship with Debtor, DIP Lender shall not be deemed to be in control of Debtor or its operations or to be acting as a "responsible person," "managing agent", "mortgagee in possession" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operation or management of Debtor.

17.     The Debtor is authorized to borrow a bridge loan of up to $750,000 from BSC Investment Group, Inc., at 0% interest with a maturity date of August 31, 2024, pursuant to 11 U.S.C. § 364(b).

9

18.      The notice given by the Debtor of the Interim Financing Motion and the final hearing on the financing motion constitutes due and sufficient notice in accordance with the Bankruptcy Rules and the Local Rules of this Court.

19.      The Court will hold a final hearing on the Motion on _____ __, 2024, at __: __ _.m. Opposition to the Motion shall be filed with the Court by no later than _____ __, 2024.  The Debtor shall file its reply to oppositions by no later than _____ __, 2024.

20.      Upon entry of this Order, the Debtor shall serve (by first class mail, postage prepaid or overnight delivery) copies of this Order on the Debtor's twenty largest unsecured creditors as identified in its Chapter 11 petition.

**IT IS SO ORDERED.**

**\*\*\* END OF ORDER \*\*\***

# EXHIBIT "3"

# Y2024 CASHFLOW PROJECTION
## (Updated 06/30/2024)

| TYPE | DESCRIPTION / MONTH | Actual | | | | | | PLAN EFECTIVE DATE OCTOBER 2024 | | | | | | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | JAN '24 | FEB '24 | MAR '24 | APR '24 | MAY '24 | JUN '24 | JUL'24 | AUG '24 | SEP'24 | OCT '24 | NOV'24 | DEC '24 | |
| Revenue | Revenue Projection | | | | | | | 249,324 | 856,402 | 1,033,416 | 1,659,744 | 1,683,156 | 1,734,363 | 7,216,405 |
| | | | | | | | | | | | | | | |
| BEGINNING CASH | BEGINNING BALANCE | 92,245 | 29,584 | 168,706 | 44,224 | 143,676 | (6,078) | (1,419) | 6,583 | 77,489 | 201,250 | 161,461 | 205,569 | 92,245 |
| CASH IN | AR: Customers | 534,102 | 553,572 | 366,109 | 770,520 | 316,458 | 150,881 | 139,750 | 872,115 | 998,014 | 1,534,478 | 1,678,474 | 1,724,122 | 9,638,593 |
| | Loan (Borrowing) | | | | | | | 750,000 | | | | | | 750,000 |
| | PO Borrowing | | | | | | | | 423,701 | 680,495 | 690,094 | 711,089 | 808,739 | 3,314,117 |
| | AR Borrowing | | | | | | | | 741,297 | 848,312 | 1,304,306 | 1,426,702 | 1,465,503 | 5,786,121 |
| | BSC | | | | | | 195,000 | | | | | | | 195,000 |
| | TOTAL CASH IN | 626,347 | 583,156 | 534,814 | 814,744 | 460,134 | 339,803 | 888,331 | 2,043,696 | 2,604,309 | 3,730,128 | 3,977,725 | 4,203,932 | 19,776,076 |
| | | | | | | | | | | | | | | |
| | MONTH | JAN '24 | FEB '24 | MAR '24 | APR '24 | MAY '24 | JUN '23 | JUL'24 | AUG '24 | SEP'24 | OCT '24 | NOV'24 | DEC '24 | TOTAL |
| CASH OUT - OPERATING ACTIVITIES | AP & (COD/CIA) Material Purchases | 57,257 | 8,062 | 11,345 | 89,766 | 31,893 | 15,328 | 351,125 | 423,701 | 680,495 | 690,094 | 711,089 | 808,739 | 3,878,893 |
| | PO Payback | | | | | | | | | 423,701 | 680,495 | 690,094 | 711,089 | 2,505,378 |
| | AR Payback | | | | | | | | | 593,038 | 826,909 | 1,213,107 | 1,402,223 | 4,035,278 |
| | PO and AR Financing Cost | | | | | | | | | | 30,291 | 45,511 | 55,516 | 131,318 |
| | Bldg Rent/CAM | 0 | 30,000 | 60,000 | 90,000 | 90,000 | 0 | 90,000 | 180,000 | 90,000 | 92,755 | 92,755 | 92,755 | 908,265 |
| | Payroll | 411,566 | 280,739 | 328,397 | 354,806 | 262,400 | 230,552 | 300,000 | 343,659 | 353,969 | 450,000 | 450,000 | 450,000 | 4,216,088 |
| | Benefit | 49,260 | 52,216 | 49,401 | 48,572 | 45,151 | 48,719 | 75,000 | 85,915 | 88,492 | 112,500 | 112,500 | 112,500 | 880,227 |
| | Commission/Incentive | 0 | 0 | 0 | 21,469 | 0 | 0 | 10,000 | 87,211 | 99,801 | 153,448 | 167,847 | 172,412 | 712,189 |
| | Tools & Supplies | 152 | 162 | 31 | 843 | 481 | 53 | 3,000 | 3,000 | 4,000 | 5,000 | 5,000 | 5,000 | 26,722 |
| | R&D: Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 88,928 | 100,000 | 100,000 | 288,928 |
| | Office Expenses | 0 | 0 | 5,028 | 5,365 | 6,612 | 1,094 | 5,000 | 7,000 | 8,000 | 9,000 | 10,000 | 10,000 | 67,100 |
| | Legal & Professional Service | 5,000 | 12,550 | 9,075 | 18,439 | 4,000 | 3,345 | 13,500 | 12,000 | 12,000 | 24,000 | 12,000 | 15,500 | 141,409 |
| | IT Software & Service | 7,791 | 9,111 | 10,170 | 13,148 | 13,680 | 5,593 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 89,493 |
| | Insurance Installment | 12,776 | 0 | 6,346 | 10,794 | 3,096 | 10,379 | 3,096 | 10,759 | 3,096 | 12,000 | 3,100 | 9,097 | 84,538 |
| | S&M/T&E | 33,613 | 13,819 | 7,492 | 10,749 | 6,974 | 17,544 | 15,000 | 16,700 | 16,700 | 16,700 | 16,700 | 16,700 | 188,691 |
| | Loan Payback | | | | | | | 750,000 | | | | | | 750,000 |
| | Facilities/OH | 0 | 0 | 305 | 6,537 | 0 | 7,702 | 4,527 | 20,262 | 18,267 | 18,267 | 20,262 | 18,267 | 114,398 |
| | Others | 19,348 | 7,790 | 3,000 | 579 | 1,926 | 913 | 6,500 | 21,000 | 6,500 | 6,500 | 6,500 | 6,500 | 87,056 |
| | TOTAL CASH OUT - OPERATING ACTIVITIES | 596,763 | 414,450 | 490,590 | 671,067 | 466,213 | 341,222 | 881,748 | 1,966,207 | 2,403,059 | 3,221,887 | 3,661,466 | 3,991,298 | 19,105,970 |
| | | | | | | | | | | | | | | |
| CASH BALANCE | | 29,584 | 168,706 | 44,224 | 143,676 | (6,078) | (1,419) | 6,583 | 77,489 | 201,250 | 508,242 | 316,260 | 212,634 | 670,106 |
| | | | | | | | | | | | | | | |
| CREDITORS | Creditors ($2.57MM) | | | | | | | | | | 37,260 | 47,439 | 31,895 | 116,594 |
| | Priority IRS Taxes | | | | | | | | | | 3,141 | | | 3,141 |
| | Priority PTO Claims | | | | | | | | | | 6,700 | | | 6,700 |
| | Chapter 11 Professionals | | | | | | | | | | 250,000 | | | 250,000 |
| | Loan ($4.47MM) | | | | | | | | | | 49,680 | 63,252 | 42,527 | 155,459 |
| | Total Creditors and Loan | | | | | | | | | | 346,781 | 110,691 | 74,422 | 531,894 |
| | | | | | | | | | | | | | | |
| ENDING CASH | | 29,584 | 168,706 | 44,224 | 143,676 | (6,078) | (1,419) | 6,583 | 77,489 | 201,250 | 161,461 | 205,569 | 138,212 | |

| | JAN '25 | FEB '25 | MAR '25 | APR '25 | MAY '25 | JUN '25 | JUL '25 | AUG '25 | SEP '25 | OCT '25 | NOV '25 | DEC '25 | 2025 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Y2025 CASHFLOW PROJECTION** | | | | | | | | | | | | | |
| | 1,972,533 | 2,000,000 | 2,060,000 | 2,121,800 | 2,185,454 | 2,251,018 | 2,318,548 | 2,388,105 | 2,459,748 | 2,533,540 | 2,609,546 | 2,687,833 | 27,588,124 |
| | 138,212 | 145,142 | 134,176 | 95,440 | 86,248 | 102,878 | 112,686 | 128,984 | 170,310 | 197,488 | 230,120 | 276,976 | 1,818,658 |
| | 1,924,899 | 1,994,507 | 2,048,000 | 2,109,440 | 2,172,723 | 2,237,905 | 2,305,042 | 2,374,193 | 2,445,419 | 2,518,782 | 2,594,345 | 2,672,175 | 27,397,430 |
| | | | | | | | | | | | | | 0 |
| | 820,000 | 844,600 | 869,938 | 896,036 | 922,917 | 950,605 | 979,123 | 1,008,497 | 1,038,751 | 1,069,914 | 1,102,011 | 1,135,072 | 11,637,464 |
| | 1,636,164 | 1,695,331 | 1,740,800 | 1,793,024 | 1,846,815 | 1,902,219 | 1,959,286 | 2,018,064 | 2,078,606 | 2,140,964 | 2,205,193 | 2,271,349 | 23,287,816 |
| | | | | | | | | | | | | | 0 |
| | 4,519,275 | 4,679,579 | 4,792,914 | 4,893,940 | 5,028,703 | 5,193,607 | 5,356,136 | 5,529,738 | 5,733,087 | 5,927,148 | 6,131,670 | 6,355,572 | 64,141,368 |
| | 808,739 | 820,000 | 844,600 | 869,938 | 896,036 | 922,917 | 950,605 | 979,123 | 1,008,497 | 1,038,751 | 1,069,914 | 1,102,011 | 11,311,131 |
| | 808,739 | 820,000 | 844,600 | 869,938 | 896,036 | 922,917 | 950,605 | 979,123 | 1,008,497 | 1,038,751 | 1,069,914 | 1,102,011 | 11,311,131 |
| | 1,457,743 | 1,602,032 | 1,683,497 | 1,731,706 | 1,782,579 | 1,836,057 | 1,891,138 | 1,947,872 | 2,006,309 | 2,066,498 | 2,128,493 | 2,192,348 | 22,326,272 |
| | 61,010 | 65,963 | 69,981 | 72,915 | 75,045 | 77,270 | 79,588 | 81,976 | 84,435 | 86,968 | 89,577 | 92,264 | 936,991 |
| | 94,401 | 94,401 | 94,401 | 94,401 | 94,401 | 94,401 | 94,401 | 94,401 | 94,401 | 96,912 | 96,912 | 96,912 | 1,140,344 |
| | 500,000 | 500,000 | 515,000 | 525,000 | 525,000 | 540,750 | 550,000 | 550,000 | 566,500 | 580,000 | 580,000 | 597,400 | 6,529,650 |
| | 125,000 | 125,000 | 128,750 | 131,250 | 131,250 | 135,188 | 137,500 | 137,500 | 141,625 | 145,000 | 145,000 | 149,350 | 1,632,413 |
| | 192,490 | 199,451 | 204,800 | 210,944 | 217,272 | 223,790 | 230,504 | 237,419 | 244,542 | 251,878 | 259,435 | 267,218 | 2,739,743 |
| | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 66,000 |
| | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 1,800,000 |
| | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 360,000 |
| | 5,500 | 6,000 | 6,500 | 7,000 | 7,500 | 8,000 | 8,500 | 9,000 | 9,500 | 10,000 | 10,000 | 10,000 | 97,500 |
| | 0 | 0 | 13,645 | 0 | 0 | 13,645 | 0 | 0 | 13,645 | 0 | 0 | 13,645 | 54,582 |
| | 20,000 | 20,000 | 20,000 | 25,000 | 25,000 | 25,000 | 30,000 | 30,000 | 30,000 | 35,000 | 35,000 | 35,000 | 330,000 |
| | | | | | | | | | | | | | 0 |
| | 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 233,907 |
| | 6,500 | 6,500 | 6,500 | 7,300 | 6,500 | 6,500 | 18,000 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 90,300 |
| | 4,295,980 | 4,473,155 | 4,646,083 | 4,761,251 | 4,870,429 | 5,020,244 | 5,157,700 | 5,267,723 | 5,429,259 | 5,573,118 | 5,705,553 | 5,879,469 | 61,079,964 |
| | 223,295 | 206,424 | 146,830 | 132,689 | 158,274 | 173,363 | 198,437 | 262,015 | 303,828 | 354,031 | 426,117 | 476,104 | 3,061,405 |
| | 33,494 | 30,964 | 22,025 | 19,903 | 23,741 | 26,004 | 29,766 | 39,302 | 45,574 | 53,105 | 63,917 | 71,416 | 459,211 |
| | 44,659 | 41,285 | 29,366 | 26,538 | 31,655 | 34,673 | 39,687 | 52,403 | 60,766 | 70,806 | 85,223 | 95,221 | 612,281 |
| | 78,153 | 72,248 | 51,391 | 46,441 | 55,396 | 60,677 | 69,453 | 91,705 | 106,340 | 123,911 | 149,141 | 166,636 | 1,071,492 |
| | 145,142 | 134,176 | 95,440 | 86,248 | 102,878 | 112,686 | 128,984 | 170,310 | 197,488 | 230,120 | 276,976 | 309,467 | |

| | | | | | Y2026 CASHFLOW PROJECTION | | | | | | | 2026 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN '26 | FEB '26 | MAR '26 | APR '26 | MAY '26 | JUN '26 | JUL '26 | AUG '26 | SEP '26 | OCT '26 | NOV '26 | DEC '26 | |
| 2,768,468 | 2,851,522 | 2,937,067 | 3,025,179 | 3,115,935 | 3,209,413 | 3,305,695 | 3,404,866 | 3,507,012 | 3,612,222 | 3,720,589 | 3,832,207 | 39,290,176 |
| | | | | | | | | | | | | |
| 309,467 | 288,122 | 302,147 | 312,176 | 347,104 | 400,691 | 438,241 | 479,648 | 547,092 | 595,692 | 660,705 | 738,961 | 309,467 |
| 2,752,341 | 2,834,911 | 2,919,958 | 3,007,557 | 3,097,784 | 3,190,717 | 3,286,439 | 3,385,032 | 3,486,583 | 3,591,180 | 3,698,916 | 3,809,883 | 39,061,301 |
| | | | | | | | | | | | | 0 |
| 1,169,124 | 1,204,198 | 1,240,324 | 1,277,533 | 1,315,859 | 1,355,335 | 1,395,995 | 1,437,875 | 1,481,011 | 1,525,442 | 1,571,205 | 1,618,341 | 16,592,241 |
| 2,339,490 | 2,409,674 | 2,481,965 | 2,556,423 | 2,633,116 | 2,712,110 | 2,793,473 | 2,877,277 | 2,963,595 | 3,052,503 | 3,144,078 | 3,238,401 | 33,202,106 |
| | | | | | | | | | | | | 0 |
| 6,570,422 | 6,736,904 | 6,944,393 | 7,153,690 | 7,393,863 | 7,658,853 | 7,914,148 | 8,179,832 | 8,478,282 | 8,764,818 | 9,074,904 | 9,405,586 | 89,165,116 |

| JAN '26 | FEB '26 | MAR '26 | APR '26 | MAY '26 | JUN '26 | JUL '26 | AUG '26 | SEP '26 | OCT '26 | NOV '26 | DEC '26 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,135,072 | 1,169,124 | 1,204,198 | 1,240,324 | 1,277,533 | 1,315,859 | 1,355,335 | 1,395,995 | 1,437,875 | 1,481,011 | 1,525,442 | 1,571,205 | 16,108,972 |
| 1,135,072 | 1,169,124 | 1,204,198 | 1,240,324 | 1,277,533 | 1,315,859 | 1,355,335 | 1,395,995 | 1,437,875 | 1,481,011 | 1,525,442 | 1,571,205 | 16,108,972 |
| 2,258,118 | 2,325,862 | 2,395,637 | 2,467,507 | 2,541,532 | 2,617,778 | 2,696,311 | 2,777,200 | 2,860,516 | 2,946,332 | 3,034,722 | 3,125,763 | 32,047,277 |
| 95,032 | 97,883 | 100,820 | 103,844 | 106,959 | 110,168 | 113,473 | 116,878 | 120,384 | 123,995 | 127,715 | 131,547 | 1,348,698 |
| 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 118,271 | 1,419,254 |
| 600,000 | 600,000 | 618,000 | 630,000 | 630,000 | 648,900 | 660,000 | 660,000 | 679,800 | 693,000 | 693,000 | 713,790 | 7,826,490 |
| 150,000 | 150,000 | 154,500 | 157,500 | 157,500 | 162,225 | 165,000 | 165,000 | 169,950 | 173,250 | 173,250 | 178,448 | 1,956,623 |
| 275,234 | 283,491 | 291,996 | 300,756 | 309,778 | 319,072 | 328,644 | 338,503 | 348,658 | 359,118 | 369,892 | 380,988 | 3,906,130 |
| 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 108,000 |
| 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 2,400,000 |
| 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 480,000 |
| 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| 0 | 0 | 18,194 | 0 | 0 | 18,194 | 0 | 0 | 18,194 | 0 | 0 | 18,194 | 72,776 |
| 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 660,000 |
| | | | | | | | | | | | | 0 |
| 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 20,859 | 18,809 | 18,809 | 233,907 |
| 6,500 | 6,500 | 6,500 | 7,300 | 6,500 | 6,500 | 18,000 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 90,300 |
| 6,127,158 | 6,272,064 | 6,464,122 | 6,619,684 | 6,777,416 | 6,984,635 | 7,176,228 | 7,338,151 | 7,561,832 | 7,748,348 | 7,938,042 | 8,179,719 | 85,187,399 |

| 443,264 | 464,841 | 480,271 | 534,006 | 616,447 | 674,217 | 737,920 | 841,681 | 916,450 | 1,016,470 | 1,136,863 | 1,225,866 | 3,977,717 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 66,490 | 69,726 | 72,041 | 80,101 | 92,467 | 101,133 | 110,688 | 126,252 | 137,467 | 152,470 | 170,529 | 183,880 | 1,363,244 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| 88,653 | 92,968 | 96,054 | 106,801 | 123,289 | 134,843 | 147,584 | 168,336 | 183,290 | 203,294 | 227,373 | 245,173 | 1,817,659 |
| 155,142 | 162,694 | 168,095 | 186,902 | 215,757 | 235,976 | 258,272 | 294,588 | 320,757 | 355,764 | 397,902 | 429,053 | 3,180,903 |

| 288,122 | 302,147 | 312,176 | 347,104 | 400,691 | 438,241 | 479,648 | 547,092 | 595,692 | 660,705 | 738,961 | 796,813 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | Y2027 CASH FLOW PROJECTION | | | | | | | | | | | Y2027 TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN '27 | FEB '27 | MAR '27 | APR '27 | MAY '27 | JUN '27 | JUL'27 | AUG'27 | SEP'27 | OCT'27 | NOV'27 | DEC'27 | | |
| 3,947,173 | 4,065,588 | 4,187,556 | 4,313,183 | 4,442,578 | 4,575,855 | 4,713,131 | 4,854,525 | 5,000,161 | 5,150,166 | 5,304,670 | 5,463,811 | 56,018,396 | |
| | | | | | | | | | | | | | |
| 796,813 | 833,039 | 894,464 | 921,948 | 1,233,484 | 1,533,656 | 1,860,022 | 2,796,753 | 3,803,067 | 4,833,560 | 5,944,115 | 7,130,706 | 796,813 | |
| 3,924,180 | 4,041,905 | 4,163,162 | 4,288,057 | 4,416,699 | 4,549,200 | 4,685,676 | 4,826,246 | 4,971,034 | 5,120,165 | 5,273,769 | 5,431,983 | 55,692,075 | |
| | | | | | | | | | | | | 0 | |
| 1,666,891 | 1,716,898 | 1,768,405 | 1,821,457 | 1,876,101 | 1,932,384 | 1,990,355 | 2,050,066 | 2,111,568 | 2,174,915 | 2,240,162 | 2,307,367 | 23,656,569 | |
| 3,335,553 | 3,435,619 | 3,538,688 | 3,644,849 | 3,754,194 | 3,866,820 | 3,982,824 | 4,102,309 | 4,225,379 | 4,352,140 | 4,482,704 | 4,617,185 | 47,338,264 | |
| | | | | | | | | | | | | 0 | |
| 9,723,437 | 10,027,461 | 10,364,720 | 10,676,311 | 11,280,478 | 11,882,059 | 12,518,878 | 13,775,374 | 15,111,047 | 16,480,779 | 17,940,751 | 19,487,241 | 159,268,538 | |
| JAN '27 | FEB '27 | MAR '27 | APR '27 | MAY '27 | JUN '27 | JUL'27 | AUG'27 | SEP'27 | OCT'27 | NOV'27 | DEC '27 | TOTAL | |
| 1,618,341 | 1,666,891 | 1,716,898 | 1,768,405 | 1,821,457 | 1,876,101 | 1,932,384 | 1,990,355 | 2,050,066 | 2,111,568 | 2,174,915 | 2,240,162 | 22,967,542 | |
| 1,618,341 | 1,666,891 | 1,716,898 | 1,768,405 | 1,821,457 | 1,876,101 | 1,932,384 | 1,990,355 | 2,050,066 | 2,111,568 | 2,174,915 | 2,240,162 | 22,967,542 | |
| 3,219,536 | 3,316,122 | 3,415,606 | 3,518,074 | 3,623,616 | 3,732,325 | 3,844,295 | 3,959,624 | 4,078,412 | 4,200,765 | 4,326,788 | 4,456,591 | 45,691,755 | |
| 135,493 | 139,558 | 143,745 | 148,057 | 152,499 | 157,074 | 161,786 | 166,639 | 171,639 | 176,788 | 182,091 | 187,554 | 1,922,922 | |
| 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 123,209 | 1,478,510 | |
| 720,000 | 720,000 | 741,600 | 756,000 | 756,000 | 778,680 | 660,000 | 660,000 | 679,800 | 693,000 | 693,000 | 713,790 | 8,571,870 | |
| 180,000 | 180,000 | 185,400 | 189,000 | 189,000 | 194,670 | 165,000 | 165,000 | 169,950 | 173,250 | 173,250 | 178,448 | 2,142,968 | |
| 392,418 | 404,191 | 416,316 | 428,806 | 441,670 | 454,920 | 468,568 | 482,625 | 497,103 | 512,016 | 527,377 | 543,198 | 5,569,208 | |
| 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | |
| 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 3,000,000 | |
| 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 | |
| 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 480,000 | |
| 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 | |
| 0 | 0 | 22,742 | 0 | 0 | 22,742 | 0 | 0 | 22,742 | 0 | 0 | 22,742 | 90,970 | |
| 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 720,000 | |
| | | | | | | | | | | | | 0 | |
| 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 384,000 | |
| 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 | |
| 8,441,838 | 8,651,362 | 8,916,914 | 9,134,456 | 9,363,408 | 9,650,322 | 9,722,125 | 9,972,307 | 10,277,488 | 10,536,664 | 10,810,045 | 11,140,357 | 116,617,286 | |
| | | | | | | | | | | | | | |
| 1,281,598 | 1,376,099 | 1,447,805 | 1,541,856 | 1,917,070 | 2,231,738 | 2,796,753 | 3,803,067 | 4,833,560 | 5,944,115 | 7,130,706 | 8,346,884 | 42,651,252 | |
| | | | | | | | | | | | | | TOTAL |
| 192,240 | 206,415 | 236,296 | | | | | | | | | | 634,950 | 2,574,000 |
| | | | | | | | | | | | | | 3,141 |
| | | | | | | | | | | | | | 6,700 |
| | | | | | | | | | | | | | 250,000 |
| 256,320 | 275,220 | 289,561 | 308,371 | 383,414 | 371,716 | | | | | | | 1,884,601 | 4,470,000 |
| 448,559 | 481,635 | 525,857 | 308,371 | 383,414 | 371,716 | 0 | 0 | 0 | 0 | 0 | 0 | 2,519,552 | |
| | | | | | | | | | | | | | |
| 833,039 | 894,464 | 921,948 | 1,233,484 | 1,533,656 | 1,860,022 | 2,796,753 | 3,803,067 | 4,833,560 | 5,944,115 | 7,130,706 | 8,346,884 | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
2818 La Cienega Avenue, Los Angeles, California 90034

A true and correct copy of the foregoing document entitled (*specify*): **Debtor's Emergency Motion for an Order (I) Authorizing Debtor to Obtain Post-petition Financing Pursuant to 11 U.S.C. § 364(c) & (d) on an Interim Basis; (II) Setting a Hearing on Final Basis; and (III) Granting Related Relief; Memorandum of Points and Authorities** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 10, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M. Arnold    tma@lnbyg.com
- Ron Bender    rb@lnbyg.com
- Corrine Bielejeski    Corrine@EastBayBkLaw.com, EastBayBkLaw@gmail.com
- Trevor Ross Fehr    trevor.fehr@usdoj.gov
- John-Patrick M. Fritz    jpf@lnbyg.com, JPF@ecf.inforuptcy.com
- Gina R. Klump    gklump@klumplaw.net, C204@ecfcbis.com
- Office of the U.S. Trustee / SJ    USTPRegion17.SJ.ECF@usdoj.gov
- Gregory S. Powell    greg.powell@usdoj.gov, Tina.L.Spyksma@usdoj.gov
- Julie H. Rome-Banks    julie@bindermalter.com
- Cheryl C. Rouse    rblaw@ix.netcom.com

**2. SERVED BY UNITED STATES MAIL**: On (*date*) **July 10, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 10, 2024,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

by Overnight Mail

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 10, 2024 | J. Klassi | /s/ J. Klassi |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

Britelab, Inc.
File No. 10277
RSN (Debtor) and 20 Largest

## 20 Largest

Tony
CPK Manufacturing, Inc.
2188 Del Franco St.
Suite 70
San Jose, CA 95131

Ken Burgess
Chamisa Technology, LLC
300 Menaul Blvd. NE
Suite A257
Albuquerque, NM 87107

Robin Lee/Nancy Fu
Eastek International Corp.
PO Box 88261
Dept A
Chicago, IL 60680

FedEx CA_3875-69006
P.O. Box 7221
Pasadena, CA 91109-7321

Amy Dedri Gilbert Encinas
Future Electronics
135 S. La Salle Street
Dept. 3261
Chicago, IL 60674-3261

Legal Department
Globalization Partners, LLC
175 Franklin Street, 17th Floor
Boston, MA 02110

Dawn Massa Stancavish
Massa Products Corporation
280 Lincoln Street
Hingham, MA 02043-1796

Rosalind
Onto Innovations, Inc. dba NANOMETRICS
1550 Buckeye Drive
Milpitas, CA 95035

Rosalind
Onyx Healthcare USA
324 West Blueridge Ave
Orange, CA 92865

Sa Lee
PHC GCM Korea
# 76 Oseongsandan-ro, Oseong-myeon
S. Korea

Roger Fields
Peninsula Land & Capital
2390 El Camino Real
Suite 210
Palo Alto, CA 94306

Carl Pallister
Polymetallurgical LLC
P.O. Box 736070
Dallas, TX 75373-6070

Milly Mai
SuNPe Prototype (HK) Co.,L
Limited GaoSha Industry Zon, Donsheng
To
China

Vishal R. Kyatham
Sun KPO Inc.
63 Summer Hill Ct.
Danville, CA 94526

Virgil Chen
Sunnytech Circuit Assembly
150 River Oaks Pkwy
Suite 100
San Jose, CA 95134

Lee Min Ho
Unique Technos Co. Ltd
136, Jiksan-ro, Jiksan-eup, Seobuk-gu
S. Korea

WCP_Woodside Capital Partners Internatio
2650 Birch Street
Suite 100
Palo Alto, CA 94306

Joann Souza
XP POWER INC.
PO Box 102578
Pasadena, CA 91189-2578

XYZ Automation
180 Chandalar Place Dr.
Pelham, AL 35124

Yeong-Sae Kim
1700 Wyatt Dr.
Suite 9
Santa Clara, CA 95054

## RSN

**BriteLab, Inc.**
6341 San Ignacio Ave.
San Jose, CA 95119

Attorneys for Landlord and Creditor
Peninsula Land and Capital, Inc. **(NEF)**
JULIE H. ROME-BANKS
Binder Malter Harris & Rome-Banks LLP
2775 Park Avenue
Santa Clara, CA 95050

Updated address
PHI
18858 Montalvo Oaks Cir.
Monte Sereno, CA 95303